**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

---

IN RE:

NATIONAL AIR CARGO, INC.,

DEBTOR.

CHAPTER 11
CASE NO. 1-14-_____

---

### DECLARATION OF BRIAN T. CONAWAY IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

BRIAN T. CONAWAY declares and says:

1. I am the Secretary and Vice President of Finance for National Air Cargo, Inc. ("Debtor"). As such, I am familiar with the overall and day-to-day operations, business and financial affairs of the Debtor.

2. I submit this declaration: (i) in support of the Debtor's voluntary petition for relief under chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"); (ii) in support of the various contemporaneously-filed requests for relief in the form of preliminary and emergency motions and applications (collectively "First Day Motions"); and (iii) to assist this Court and other interested parties in understanding the circumstances giving rise to the commencement of the Debtor's chapter 11 case ("Chapter 11 Case"). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to allow for the Debtor's continued operatiions.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, review of relevant documents, information provided to me by employees working under my supervision, or opinions based upon experience, knowledge and information concerning the operations of the Debtor and the global air-based freight forwarding

industry. If called to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

## I. PROCEDURAL BACKGROUND

4. On October 17, 2014 ("Petition Date"), the Debtor will commence this Chapter 11 Case by filing a voluntary petition ("Voluntary Petition") for relief under Chapter 11 of the Bankruptcy Code.

5. The Debtor will continue to operate its business and manage its properties as debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

## II. DEBTOR SUMMARY

### A. *Organization & Operations*

6. The Debtor is a New York registered corporation headquartered in Orchard Park, New York, which is wholly owned by National Air Cargo Holdings, Inc., a Florida corporation. As of the Petition Date, the Debtor has a total of 80 employees, including 56 based in Western New York.

7. As part of a global business, the Debtor operates as an air-based freight forwarder for cargo originating from, or destined for, North and South America.[1] The Debtor essentially functions as a broker facilitating the movement of cargo through: (i) the utilization of aircraft from various sources, including corporate affiliates and other commercial carriers; and (ii) other modes of transportation over the roads, railways and oceans.

---

[1] Multiple non-debtor affiliates provide services for other regions throughout the world (Japan, Middle East, etc.).

### B. *Intercompany Transactions*

8. An affiliated Florida corporation, National Air Cargo Group, Inc. d/b/a National Airlines ("National Airlines"), a wholly owned subsidiary of NAC Acquisitions LLC (a Delaware registered limited liability company), is a Part 121 carrier and registered member of the Civil Reserve Air Fleet ("CRAF") specializing in time-sensitive and heavy-lift domestic and international cargo solutions under contracts with the U.S. Department of Defense ("DOD").

9. The DOD contracts directly with National Airlines, who in turn subcontracts with the Debtor to provide mission-critical logistics support through the timely delivery of essential supplies and materials that keep military operations running uninterrupted.

10. Approximately 80% of the Debtor's revenues are generated from National Airlines' military-related operations for the DOD.

11. As set forth in more detail below, the Debtor incurs all of the expenses associated with the freight forwarding services and then invoices National Airlines for those expenses and its services. National Airlines invoices and receives payments from the DOD, with those funds allocated and then transferred cross-stream to the Debtor in payment of the Debtor's invoices to National Airlines.

12. In addition, the Debtor provides freight forwarding services for other unrelated third party clients. Those customers are invoiced for the services and related expenses, with payment received directly by the Debtor. The Debtor's largest assets are its accounts receivables, with National Airlines as the most significant account debtor.

### C. *Profit-Sharing Model*

13. The Debtor is solely responsible for all logistics on the U.S.-based side of the global transactions (ground transportation, airline booking, etc.). For example, the Debtor

arranges for all of the cargo logistics when the point of origin is in North America to the point where the cargo departs the North American continent. Once the cargo is airborne or on the ocean, the logistical services shift to an affiliate of the Debtor that provides similar services to the point of destination. By way of example, if the cargo's point of origin is Chicago, with a final destination of Baghdad, Iraq, the Debtor will arrange for all of the logistics to the point of departure from the United States. Once airborne or on an oceanic vessel, the Debtor's Middle East-based affiliate assumes responsibility through the point of destination. The reverse protocol applies when the point of origin is outside of North or South America with a final destination in either of the Americas.

14. The Debtor and destination affiliate split profits 50/50. Allocation is predicated upon the construct that each provides equal services and effort to successful completion of the delivery.[2] If the transportation originates and ends in the Debtor's region of North and South America, the Debtor retains 100% of the profits.

15. The affiliate in the destination region invoices the Debtor the amount necessary to achieve the 50/50 profit split. The Debtor, in turn, records a receivable due from National Airlines equal to the amount invoiced to the customer.

16. The Debtor and its affiliate scrupulously track and account for all intercompany transactions and each maintains its own bank accounts and separate financial records, consistent with proper protocols required to maintain the legal and operational separation between affiliates.

17. Post-petition continuity of the intercompany relationships and transactions is vital to the Debtor's continued operations, management of cash flow and preservation of jobs not just

---

[2] This method of allocation has been reviewed and approved by the Debtor's outside accountants and passed an IRS audit.

4

here in Western New York, but around the world. Any disruption in this arrangement would have a deleterious impact upon the delivery of services to customers, including the DOD.

### D. *Events Leading to Chapter 11*

18.     The Debtor's reliance upon military contracts was largely responsible for its financial successes throughout the 2000's, as DOD spending and operations overseas were at historically high levels. However, beginning late in 2012, several external factors adversely affected the Debtor's operations and finances.

19.     Starting in 2008, the steady withdrawal of U.S. military personnel from the Middle East curtailed the DOD's need for freight forwarding services, particularly when compared to the peak of U.S. military involvement in Iraq and Afghanistan. Fewer troops and other personnel on the ground meant a reduced need for supplies and other cargo.

20.     Concurrent with the DOD's continued Middle East scale down, the federal government's budget sequestration affected the economy, with severe ramifications throughout all defense-related industries.

21.     Due to the DOD Middle East scale down and overlay of the federal budget sequestration, the Debtor had to lay off approximately 15% of its employees and implemented other cost-saving measures to offset the adverse financial impact.

22.     For the calendar year ending 2012, the Debtor's balance sheet reflected negative equity of $34,400,000 (assets of $7,800,000 less liabilities of $42,200,000).[3] The 2013 results show some improvement, as the Debtor's negative equity improved slightly to $31,000,000 (assets of $8,200,000 less liabilities of $39,200,000). The first half of 2014 suggests more improvement as the profit and loss results continue to demonstrate a recovery.

---

[3] The Debtor's current assets primarily consist of accounts receivable and to a lesser degree, depreciating fixed assets.

5

23. The aforementioned financial circumstances alone would not have necessitated the Debtor seeking relief under chapter 11 of the Bankruptcy Code. In February 2011, the Debtor was sued for breach of contract by Global BTG LLC ("Global") in the United States District Court for the Central District of California ("Global Litigation"). At the conclusion of a jury trial and after consideration of post-trial motions, on or about April 24, 2014, an amended judgment was entered in favor of Global and against the Debtor for $9,927,232.00 ("Global Judgment").

24. The Debtor is actively pursuing an appeal, but in the last several months, Global has instituted enforcement proceedings in various jurisdictions. The Debtor explored the prospects for filing an appeal bond, but it was cost prohibitive. Of immediate concern and potential detriment to the Debtor's operations, Global issued a 'Notice of Levy under Writ of Execution' against the Debtor's primary Operating Account (as defined below) that resulted in the restraint of over $500,000.[4]

25. Consistent with its fiduciary duties, the Debtor filed this Chapter 11 Case to preserve its assets, maintain its business operations, which are important to the United States' military interests, and to insure fair and equitable treatment for all of the creditor constituents. If Global were not stayed from pursuing its enforcement actions all of the Debtor's other creditors would suffer.

---

[4] In accordance with the automatic stay, the Debtor is making a demand upon Global to release the Levy against the account. If Global refuses, the Debtor will pursue release of the Levy via separate motion or adversary proceeding before this Court.

## III. BANKRUPTCY FILING

### A. *Voluntary Petition*

26.     Global's judgment enforcement proceedings are a real and significant threat to the Debtor's viability. This Chapter 11 Proceeding was precipitated by Global's actions, which would otherwise defeat any hope for the Debtor's financial turnaround. Certainly, other creditors would suffer and be impaired if Global were permitted to continue seizing assets. Moreover, the Debtor is confident that it will prevail upon appeal.

27.     The absence of several common bankruptcy issues and constituencies strengthens the Debtor's potential for successful reorganization – no real property to deal with, no secured creditors and no known outstanding tax obligations as of the Petition Date.

28.     The Debtor requires the protection of the bankruptcy stay while it continues to improve its operations and financial performance, and prosecutes the appeal of Global's judgment. It is the Debtor's intent to formulate a plan of reorganization in a timely manner.

### B. *First Day Motions*

29.     In conjunction with the Voluntary Petition, the Debtor is filing the following First Day Motions:

  i)     Motion for Order (I) Allowing Ordinary Course Intercompany Transactions and (II) Authorizing Debtor to Maintain Existing Bank Accounts and Business Forms ("Banking Motion");

  ii)    Motion for Order (i) Authorizing Debtor's Payment of Certain Prepetition Employee Obligations and Continuation of Prepetition Employee Benefits and (ii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers ("Payroll Motion"); and

iii) *Ex Parte* Motion for Order Shortening Time, Prescribing Notice and Scheduling an Expedited Hearing for First Day Motions ("Expedited Hearing Motion").

30. The relief requested in the Banking Motion is necessary to protect the Debtor's primary revenue stream from disruption and maintain unimpaired operations. The prepetition structure of the cash flow and intercompany transactions are essential to the continuity of the Debtor's operations. If disrupted, the Debtor will be unable to fulfill its obligations as a debtor-in-possession (i.e. paying ordinary administrative expenses).

31. In order to protect the lifeblood of the Debtor's business, the Payroll Motion seeks authority to pay various forms of outstanding employee-related obligations, such wages, expenses, benefits and related withholdings (collectively "Employee Obligations").[5] The uninterrupted service of all employees is essential to the Debtor's continuing operations and ability to reorganize. If the Debtor fails to pay the prepetition Employee Obligations, it will create financial hardship for, cause low morale and lead to the likely exodus of critical employees. All of which could have a devastating impact on the Debtor, and all of its employees and creditors.

32. As noted above and detailed in the filings, each of the First Day Motions is critical to the Debtor's operations and ability to successfully navigate the bankruptcy process. As such, the Expedited Hearing Motion will avoid any unnecessary or harmful stoppages in the Debtor's day-to-day business, which is in the best interests of the estate and all creditors.

33. In addition to the First Day Motions detailed above, the Debtor is filing an Application to Employ and Retain HARTER SECREST & EMERY LLP ("HSE") as Counsel to

---

[5] To the extent applicable, the Employee Obligations will not exceed the statutory cap of $12,465 per employee.

8

Debtor and Debtor in Possession *Nunc Pro Tunc* to the Petition Date ("Counsel Motion"). Although the Counsel Motion will not be heard with the First Day Motions, it is just as critical and necessary for the Debtor's meaningful engagement in the bankruptcy process. HSE has been working with the Debtor for the last few months as it considered all procedural options. In doing so, HSE has acquired extensive and intimate knowledge of the Debtor's operations and finances. The combination of HSE's acquired knowledge and expert counsel make it the ideal candidate to handle the Debtor's bankruptcy proceedings.

34. From a procedural standpoint, the Debtor is also filing a Motion for Order Extending Deadline for Debtor to File Its Schedules of Assets and Liabilities and Statement of Financial Affairs ("Schedules Motion"). As detailed herein and the First Day Motions, the complexity of the Debtor's business requires additional time to prepare accurate and thorough schedules of assets and liabilities, and statement of financial affairs. Accordingly, the Debtor is seeking an additional forty-five (45) days, without prejudice to the Debtor's ability to request additional time should it become necessary.

35. I respectfully request that all of the relief requested in the First Day Motions, Counsel Motion, Schedules Motion, and such other relief as maybe just and proper, be granted.

[*SPACE INTENTIONALLY LEFT BLANK – SIGNATURE BLOCK ON NEXT PAGE*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 15, 2014

_____
Brian T. Conaway