UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

IN RE:

NATIONAL AIR CARGO, INC.,

DEBTOR.

CHAPTER 11
CASE NO. 14-12414-MJK

**MOTION OF GLOBAL BTG LLC FOR APPOINTMENT OF CHAPTER 11 TRUSTEE**

TO THE HONORABLE MICHAEL J. KAPLAN
UNITED STATES BANKRUPTCY JUDGE:

Global BTG LLC, ("Global"), by its attorneys, Perkins Coie LLP, moves for appointment of a Chapter 11 Trustee in the bankruptcy case of National Air Cargo, Inc. ("NAC") and states as follows.

## PRELIMINARY STATEMENT

1. This case is now into its third year, yet NAC has made no progress toward emergence from Chapter 11. NAC's management has demonstrated time and time again that it is incapable of guiding the Debtor through this Chapter 11. NAC's management is not equipped to formulate a plan of reorganization (let alone confirm one) and should no longer be allowed to direct the Debtor.

2. Mr. Alf and his hand-selected people—none of whom has any experience relevant to the Debtor's business or a Chapter 11 case, and one of which (the CFO) moonlights in the Colorado pot industry while at the same time preparing and signing under oath the monthly operating reports—should be replaced by a Chapter 11 Trustee with expertise in bankruptcy and restructuring matters to supervise the administration of NAC's estate for the protection of

creditors and other interested parties, including the Debtor's employees. The circumstances present here clearly demonstrate "cause" to appoint a Chapter 11 Trustee.

3.    Here the Debtor is entirely controlled by Mr. and Ms. Alf, whose historical decision making is subject to serious question both pre-petition and post-petition. Just some examples (more fully outlined below) that support a finding of cause to appoint a Chapter 11 Trustee include:

a.    Pre-Petition: Mr. and Ms. Alf's pre-petition conduct is well known to the District Court for the Western District of New York ("WDNY"). Prior to the petition, NAC pleaded guilty in the WDNY to felony charges of making material false statements to the federal government. NAC paid a record-setting fine of $28M.

b.    Post-Petition: The Debtor surreptitiously transferred its intellectual property to Non-Debtor Affiliates[1] without this Court's approval.

c.    Post-Petition: Losses continue to mount, including over $1.6M in losses over the last two operating reports. If the operating reports are correct, the Debtor now has a negative net income for the pendency of this bankruptcy case, making confirmation of a plan impossible. The Debtor is administratively insolvent and is not keeping current with its post-petition administrative expenses. As a result, a plan is not confirmable.

d.    Post-Petition: Operating reports are consistently late and riddled with errors.

---

[1] Capitalized terms used, but not defined herein, shall have the meaning ascribed to such terms in Global's Motion for Relief From the Automatic Stay being filed contemporaneously with this Motion.

e. Post-Petition: A discrimination lawsuit is actively being litigated against Ms. Alf and a Non-Debtor Affiliate in Florida related to discriminatory treatment in violation of the Florida Civil Rights Act. If found liable, the Debtor may be adversely affected under government contracting rules (and could lose all government contracts).

f. Pre- and Post-Petition: Ms. Alf is paid for a no-show job which has amounted to hundreds of thousands of dollars. Mr. Alf and the Debtor authorized the payments. The conduct has continued for years, despite objections by creditors, the Committee and Global.

g. Post-Petition: Mr. Alf has commingled funds of the Debtor and Non-Debtor Affiliates.

h. Pre- and Post-Petition: The Committee in its adversary proceeding complaint alleges that at Mr. Alf's direction, hundreds of millions of dollars were fraudulently transferred to Non-Debtor Affiliates.

4. Without question Mr. Alf's stewardship of the Debtor is the single largest factor in its demise. A Board of Directors consisting of just one person is not a formula for success. When that one person is Mr. Alf whose past is so checkered, it is a recipe for disaster. Mr. Alf has continued his pre-petition ways well into the bankruptcy case. If allowed to continue, Mr. Alf will destroy all value of the Debtor.

5. Given Mr. Alf's past failures, creditors and stakeholders (including employees) should not accept the notion that Mr. Alf is the best person to supervise the administration of the estate.

6. Based on just the facts outlined above, sufficient cause exists to appoint a Chapter 11 Trustee. Appointment of a Chapter 11 Trustee will preserve value for creditors while repairing transparency, and will hopefully return value to creditors.

## BACKGROUND FACTS RELEVANT TO GLOBAL'S REQUEST FOR A CHAPTER 11 TRUSTEE

### A. The Debtor's Director and Officers Are Unqualified and Not Performing Their Functions

7. Mr. Alf appears to be the Debtor's only Director. In and of itself, having one director in an entity with millions of dollars of revenue is less than ideal. The officers are listed as Ms. Lori Alf, Mr. Glen Joerger, Mr. Brian Conaway, Ms. Shirley Kaufman, Mr. Marc Gonzales and Ms. Margaret Bradford. Several of the officers have resigned during the nearly three-year pendency of this case. It is unclear if new officers or directors have been hired. Despite repeated requests, the Debtor has failed to provide this information.[2]

8. The Debtor's CFO moonlights in the Colorado pot industry; one of NAC's officers, Lori Alf, has a no-show job and is a defendant in a discrimination lawsuit that could result in the termination of all of the Debtor's revenue if she is found liable; Mr. Alf has misappropriated the Debtor's intellectual property—and the list goes on.

### B. NAC's Pre-Petition Felonious Conduct

9. As every elementary school student was taught early on, honesty is the best policy. Honesty is good for governance. Honesty is required by the Bankruptcy Code and Bankruptcy Rules. Honesty is required in life and business. Honest dealings are a hallmark of our system of justice and business.

[2] The Debtor has continually failed to amend its schedules and statement of financial affairs on a multitude of material changes in the bankruptcy case. Failure to update the statement of financial affairs with changes as to officers and directors is but one example. *See In re Skaggs, Richard & Connie*, 349 B.R. 594 (Bankr. E.D. Mo. 2006) (finding that schedules and statements must be kept current).

10.    Honesty apparently is not something Mr. Alf possesses.  Combine a lack of honesty with a six-year investigation by the Defense Department's Criminal Investigative Service, the FBI and the U.S. Army Criminal Investigation Division, and you get a felony conviction and a $28M fine (which consisted of criminal restitution of $4.4M, a criminal penalty of $8.8M, and forfeiture of assets of $3.05M and $11.75M to resolve allegations that NAC violated the False Claims Act).  All of this occurred not only on Mr. Alf's watch, but he was the central figure in the government's case against NAC.

11.    The United States Attorney at the time, Terrance Flynn, stated "[t]his felony conviction, which includes the largest criminal and civil penalties ever imposed in the WDNY, makes it clear that dishonest corporate entities are not immune from bearing substantial consequences arising from their deliberate efforts to cheat the American public."[3]

12.    The scam run by NAC was simple: charge for accelerated delivery while delivering goods days later than promised.  In the event a customer complained, they got their money back.  Those that didn't complain were overbilled.  A tidy (but illegal) profit resulted.

13.    Mr. Alf's mismanagement of the Debtor dates back to the turn of this century.  He has used the Debtor as his personal piggy bank and directs it without regard for the law.  He got caught pre-petition for his conduct that nearly forced the Debtor out of business.  He has now been caught in another fraud (this time a fraud on this Court) post-petition, as outlined below.

**C.    Mr. Alf and the Non-Debtor Affiliates Defrauded the Debtor Post-Petition**

14.    On October 17, 2014 (the "Petition Date"), NAC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

---

[3] The Department of Justice's press release can be found at
https://www.justice.gov/archive/opa/pr/2008/March/08_civ_236.html (Department of Justice, *National Air Cargo to Pay U.S. $28 Million to Resolve Allegations of Defrauding the Department of Defense*, March 26, 2008, www.usdoj.com)

15.     In 2015, after the Petition Date, Mr. Alf apparently determined that trademarks owned by the Debtor should be transferred to a Non-Debtor Affiliate, National Air Cargo Group, Inc. ("NAC Group").  Thereafter, this transfer was allegedly completed at Mr. Alf's direction.

16.     Annexed as **Exhibit A** is the trademark owned by the Debtor.  It was registered with the United States Patent and Trademark ("USPTO") office in 2009 ("TM 1").  The Debtor lists TM 1 as an asset on Schedule B, Item 22.  Court approval was not obtained to take any action with respect to TM 1.  No disclosure of any transfer, other amendment or alteration was made.

17.     Annexed hereto as **Exhibit B** is the trademark prosecuted and owned (illegally) by a Non-Debtor Affiliate ("TM 2").  In filings with the USPTO, NAC Group used TM 1 as support for its application.

18.     Once the USPTO granted approval to NAC Group for TM 2, TM 1 was cancelled just weeks later.

19.     All of the above was done without any application to the Court, let alone Court approval.  It is unclear (and given the impeccable reputation of Debtor's counsel, it would seem to be extremely unlikely) if Debtor's counsel is or was aware of this fraud on the Court, or if Mr. Alf even advised Debtor's counsel of the actions he undertook regarding TM 1.  Presuming Debtor's counsel was not advised, this factor alone is enough to appoint a Chapter 11 Trustee.

**D.     The Debtor's Losses Are Beginning to Mount**

20.     The Debtor's last two operating reports show that it is in free fall.

21.     The Debtor purportedly lost $882,000 in December 2016 and then a nearly identical amount in January 2017.  No report has been filed for February or March.

22. Moreover, the Debtor's January 2017 Monthly Operating Report reflects that the Debtor has apparently accumulated over $1.1M in unpaid intercompany transactions since the Petition Date. The report reflects the following amounts:

| NAME OF CREDITOR | SCHEDULED MONTHLY PAYMENT DUE | AMOUNT PAID DURING MONTH | TOTAL UNPAID POST-PETITION |
|---|---|---|---|
| Central Park Management LLC* | 1,696.00 | - | - |
| ComDoc, Inc. | Depends on usage | 7.57 | - |
| Mizner Park Office Plaza | 5,848.90 | 11,697.80 | - |
| Signature Flight Support Corporation | - | - | - |
| Windward Drive Lot 12 LLC (Intercompany) | 29,700.00 | NA | 801,900.00 |
| Braxton Acquisitions, LLC (Intercompany) | | NA | 281,000.00 |
| LA 45 Equipment, LLC (Intercompany) | | NA | 52,500.00 |
| | | | |
| | TOTAL PAYMENTS | 11,705.37 | 1,135,400.00 |

23. The Debtor is also grossly behind on its fees to professionals in the case, according to the January 2017 Monthly Operating Report. The report reflects the following amounts:

| PROFESSIONALS | | | | | |
|---|---|---|---|---|---|
| NAME | DATE OF COURT ORDER AUTHORIZING PAYMENT | AMOUNT APPROVED | AMOUNT PAID | TOTAL PAID TO DATE | TOTAL INCURRED & UNPAID* |
| Province, Inc. | | 426,967.34 | 43,937.03 | 359,714.22 | 67,253.12 |
| Harter Secrest & Emery LLP | | 302,519.05 | 47,500.00 | 255,003.74 | 47,515.31 |
| Mesirow Financial Consulting | | 201,086.25 | - | 201,086.25 | - |
| Pachulski, Stang, Ziehl & Jones, LLP | | 689,404.59 | 90,000.00 | 406,977.84 | 282,426.75 |
| Huron Consulting Services LLC | | 70,437.00 | - | - | 70,437.00 |
| Lippes Mathias Wexler Friedman LLP | | | | | |
| | | | | | |
| TOTAL PAYMENTS TO PROFESSIONALS | | | | | |

## E. The Debtor Consistently Files Late Operating Reports Riddled with Errors

24. At the 341 Meeting the Debtor was advised by the Office of the United States Trustee that it had to remain current on its Post-Petition Obligations and file timely monthly operating reports (a fundamental tenant of being a debtor in possession). The following colloquy took place at the 341 Meeting:

> *United States Trustee*: "You understand you have to file monthly financial statements each month with our office."
>
> *Debtor's CFO*: "You will have them by the end of the week."

> *United States Trustee*: "You understand you must remain current with your post-petition obligations as they become due."
>
> *Debtor's CFO*: "Yes."

341 Meeting at Minute 55:00.

25. It appears the admonition from the Office of the United States Trustee did not help. As of the filing of this Motion, the last report filed was the January 2017 operating report (which was filed just before the filing of this Motion and months late). A review of operating reports in this case reflects that reports are routinely filed late, and often months late.

26. In the October 2016 Monthly Operating Report, there was a nearly $2M swing in net income. Alarmed, Global immediately began to look into the issue in conjunction with the Committee's professionals to understand what had occurred.

27. The Committee's financial advisors contacted Mr. Michael Tew, the Debtor's third CFO during the pendency of the case (who moonlights in the Colorado pot industry, a violation of federal law and at odds with governmental contracting standards), who acknowledged the mistake and filed a corrected statement only after being pushed by Global and Committee counsel.

28. Global and the Committee's financial advisor have continually reached out to the Debtor and its financial advisors to get answers to what is clearly becoming a financial meltdown. None have been forthcoming. Specifically, since the filing of the December 2016 Monthly Operating Report, the Committee's financial advisors have repeatedly reached out to the Debtor to ask about the massive losses that month (and the subsequent January report which shows similar losses), but the Debtor has entirely failed to respond. The Debtor has become a black box and simply will not operate under the transparency required by the bankruptcy process.

## F. An Officer of the Debtor Is Subject to a Discrimination Lawsuit That May Bar the Debtor From Receiving Future Government Contracts

29. While Ms. Alf does no actual work for the Debtor and has collected $400,000 to date in the bankruptcy case (as detailed in the following section), she is very active in other business endeavors.

30. According to a lawsuit filed in Florida (the "Florida Litigation"), annexed hereto as **Exhibit C**, it appears that an affiliate of the Debtor, National Air Cargo Holdings, Inc., owns an ice skating rink called Palm Beach Ice Works L.L.C. (the "Skating Rink"), located in Palm Beach County, Florida.

31. Ms. Alf is a board member of the Skating Rink. Ms. Alf is also an officer of the Debtor according to the statement of financial affairs. Mr. Alf is an officer or board member of National Air Cargo Holdings, Inc., a defendant in the Florida Litigation, as well as the sole director of the Debtor. In sum, Mr. Alf and Ms. Alf span the management of the Skating Rink, National Air Cargo Holdings, Inc. and the Debtor.

32. As outlined in the Complaint, a young Iraqi-born figure skater was training at the Skating Rink. One day, the skater wore a jacket with an embroidered picture of ice skates with the small wording "Iraq."

33. Ms. Alf, upon seeing the word "Iraq" announced that that no skater would be allowed at the rink who was from Iraq. She allegedly stated that "[t]here won't ever be an Iraqi skater at the Olympics. Over my dead body." Complaint ¶ 38.

34. Ms. Alf then later bragged to others about how she "single-handedly drove the Iraqis" out of the rink." *Id.* ¶ 57.

35. The Complaint outlines conduct which is not only outrageous, but has the potential to destroy the Debtor.

36.     The overwhelming majority of the Debtor's business comes from government contracts.  Federal contracting law is governed by detailed and broad regulations.  A violation can result in the termination of all federal contracts.  For example, a violation of FAR 9.104-1 can result in a loss of all prospective government contracts in the event a contractor is found to not have a "satisfactory record of integrity and business ethics."

37.     The conduct described in the Complaint is more than enough to result in the termination of all future government contracts.  If and when the federal government learns of Mr. and Mrs. Alf's conduct in this and other matters, those contracts are in serious jeopardy.  In the event the government terminated the contracts on which the Debtor is entirely dependent, the Debtor would be left with no revenue.

38.     Mr. Alf and Ms. Alf should be immediately removed from all activities related to the Debtor to protect the Debtor's revenue stream received from the federal government—the lifeblood of its business.

**G.      Insiders Have Been Given No-Show Jobs by Mr. Alf**

39.     It appears that at least one of the insiders is being paid for a no-show job.  Despite repeated requests by Global as to what services Ms. Alf performs for the Debtor (and requests for her employment contract), the Debtor has failed to identify a single action Ms. Alf has taken on the Debtor's behalf since the filing.  Ms. Alf lives thousands of miles from the Debtor's location and does not appear to ever be physically present for work.  Ms. Alf clearly does not work for the Debtor.

40.     Despite this, the monthly operating reports show that she has been paid nearly $400,000 since the commencement of the case.  Mr. Alf has been paid over $1.3M since the inception of the case.  Interestingly, Mr. Alf has directed that he and Ms. Alf be paid while the

estate's professionals are not being paid. The December 2016 Monthly Operating Report reflects the following amounts paid to insiders:

| INSIDERS | | | |
|---|---|---|---|
| NAME | TYPE OF PAYMENT | AMOUNT PAID | TOTAL PAID TO DATE |
| Christopher Alf | Salary | 69,230.79 | 1,326,923.48 |
| Lori Alf | Salary | 20,769.24 | 398,077.10 |
| Margaret Bradford | Salary | 11,307.72 | 221,615.92 |
| Marc Gonzales | Salary | 8,076.93 | 164,266.35 |
| Eric Danat | Salary | 6,695.92 | 75,926.80 |
| | | | |
| | | | |
| TOTAL PAYMENTS TO INSIDERS | | 116,080.60 | 2,186,809.65 |

**H. No Separation Exists Between the Debtor's and Non-Debtor Affiliates' Finances**

41. The Debtor has taken great pains to claim that its finances are separate from the Non-Debtor Affiliates. However, recent conduct by the Debtor calls those representations into serious question.

42. On November 9, 2016, Debtor's counsel emailed the undersigned to advise that Global had improperly restrained property of the Debtor. A copy of the letter attached to the email is annexed as **Exhibit D**. The Debtor asserted that the property belonged to the Debtor, was property of the bankruptcy estate, and the automatic stay applied. In the email (to which the letter was attached), Debtor's counsel advised that if the levy was not immediately released, "our office will have to proceed with the appropriate violation of the automatic stay motion in the WDNY Bankruptcy Court." In essence, the Debtor threatened to sue Global for actions it alleged were restraining estate property.

43. Global, however, had already released the lien with the U.S. Marshal nearly a year earlier. A copy of the letter releasing the levy is attached as **Exhibit E** along with fax confirmation. Global made clear that it did not know whose property this was, but that it should be released to the "proper party." The U.S. Marshal took no action at that time.

44. Just a week after the Debtor's letter, Global's counsel then received an email from Mr. Eric Galler dated November 16, 2016 purportedly on "behalf of NAC Middle East FZE" seeking release of the same property.

45. Mr. Galler subsequently wrote to the U.S. Marshal with a copy to Global's counsel (along with some colorful language), demanding payment be made immediately to NAC Middle East FZE and not the Debtor, directly contradicting what the Debtor had instructed just a week earlier.

46. It is still unclear whose property this actually is. But what is clear is that Mr. Alf takes whatever position best suits him at the moment. In addition, neither Debtor's counsel nor Mr. Galler seems to know whose property this is—probably because the Debtor commingles estate property with Non-Debtor Affiliates.

**JURISDICTION AND VENUE**

47. The statutory predicates for this Motion are § 1104[4] and Bankruptcy Rules 2012 and 9014.

48. Venue of this Motion is proper pursuant to 28 U.S.C. § 1334.

49. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate).

**RELIEF REQUESTED**

50. Global believes that the appointment of a Chapter 11 Trustee is in the best interests of the Debtor's estate and all stakeholders. Global submits that with proper administration, substantial value may eventually be returned with a Chapter 11 Trustee; however, without one the Debtor is doomed.

---

[4] All "Section" references are to the United States Bankruptcy Code. All Bankruptcy Rule references are to the Federal Rules of Bankruptcy Procedure.

51. Global requests the appointment of a Chapter 11 Trustee to: (i) replace NAC's management; (ii) perform the tasks required under § 1106 of the Bankruptcy Code, specifically including investigating the financial affairs of the Debtor, the Debtor's post-petition conduct, and potential causes of action the Debtor may have that would result in additional sums of money coming into the estate (including claims against Non-Debtor Affiliates); and (iii) any other services deemed appropriate by the Chapter 11 Trustee.

## LEGAL ARGUMENT

### A. The Standard to Appoint a Trustee

52. Generally, a debtor in a Chapter 11 case remains in possession of its assets and continues to manage its affairs as a fiduciary for its creditors. 11 U.S.C. §§ 1107, 1108; *see Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

53. But this general rule subjects the Debtor's management to removal if it does not act as a fiduciary for creditors and act in a manner that protects and conserves property of the estate "for the benefit of creditors." *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988); *see In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).

54. When the system breaks down (as it has here) and the debtor fails to fulfill its fiduciary responsibilities (as Mr. Alf has), there is a safety valve. That safety valve is a Chapter 11 Trustee. Global submits that it is necessary to appoint a Chapter 11 Trustee immediately.

### B. There Are Two Alternative Paths for Appointment of a Chapter 11 Trustee, Both of Which Are Satisfied

55. The Bankruptcy Code provides two paths for the appointment of a Chapter 11 Trustee. The first, codified in § 1104(a)(1), is "for cause," and is used for actions such as fraud, dishonesty, incompetence or mismanagement. The second standard, codified in § 1104(a)(2), is

a more general catchall to appoint a trustee when it is in the interest of creditors. Global submits that both standards are satisfied.

56. Section 1104(a) provides in pertinent part:

> a. At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

**C. Global Satisfies the "For Cause" Standard of § 1104(a)(1)**

**Global Is a "Party in Interest"**

57. Only a "party in interest" may bring a motion seeking to appoint a trustee. A "party in interest" is not defined in the Bankruptcy Code. However, it is generally intended to encompass any party with an interest in the matter before the court. *See Term Loan Holder Comm. v. Ozer Grp., L.L.C. (In re Caldor Corp.)*, 303 F.3d 161, 172 (2d Cir. 2002).

58. There is little doubt that Global is a "party in interest"—Global has the largest claim in the case, eclipsing all other claims combined. Global satisfies the party-in-interest test.

**"Cause" Exists for the Immediate Appointment of a Chapter 11 Trustee**

59. The "for cause" standard includes the specific factors enumerated in § 1104(a)(1): fraud, dishonesty, incompetence or gross mismanagement, all of which are present in this case (and only one of which is required for appointment of a Chapter 11 Trustee).

60. Courts have wide discretion to evaluate 'cause' on a case-by-case basis. *See In re Marvel Entertainment*, 140 F.3d at 473; *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa. 1998). Global acknowledges that appointment of a Chapter 11 Trustee requires evidence of fraud, dishonesty, incompetence or gross mismanagement, as well as a showing of cause under § 1104(a)(1) by clear and convincing evidence. *See In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y 2007). "[T]he concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct." *In re Gen. Oil Distribs., Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984); *see also Schuster v. Dragone*, 266 B.R. 268, 272 (D. Conn. 2001). Moreover, "[a] court may consider <u>both</u> the pre and post-petition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee." *In re 1031 Tax Group*, 374 B.R. at 86. It is important to note that in this case there is conduct that satisfies the standard <u>both</u> pre- and post-petition.

61. The grounds constituting cause for the appointment of a trustee are broad. *See* 7 Collier on Bankruptcy ¶¶ 1104.02[3][c], 1104.12 (15th ed. rev. 2003) (noting "fraud, dishonesty, incompetence and gross mismanagement . . . are not the exclusive bases for finding cause for the appointment of a trustee"). The language of § 1104(a) "does not promulgate an exclusive list of causes for which a trustee must be appointed[.]" *In re Marvel Entertainment*, 140 F.3d at 472. The "'concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide range of conduct,' and courts must be given the discretion necessary to determine if the

debtor-in-possession's 'conduct shown rises to a level sufficient to warrant the appointment of a trustee.'" *Id.* (citing *Comm. of Dalkon Shield Claimants v. A.H. Robins Co*., 828 F.2d 239, 242 (4th Cir. 1987)). Courts have relied upon the following factors to determine whether to appoint a trustee:

> (1) Materiality of the misconduct;
>
> (2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers;
>
> (3) The existence of pre-petition voidable preferences or fraudulent transfers;
>
> (4) Unwillingness or inability of management to pursue estate causes of action;
>
> (5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
>
> (6) Self-dealing by management or waste or squandering of corporate assets.

*See In re Intercat, Inc*., 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000) (citing *Dalkon Shield*, 828 F.2d at 239).

62. For cause is broader than the specific enumerated factors in § 1104(a)(1) and "is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). Stated another way, for cause covers a myriad of actions a debtor may improperly take, and can be found simply where appointment is in the interests of creditors. *See In re Okla. Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988). "[S]ection 1104 represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *See In re Bellevue Place*, 171 B.R. at 623 (citing *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989)).

63. Indeed, once a court finds that cause exists, appointment of a trustee is mandatory; the court "has no discretion but must appoint a trustee." *In re Oklahoma Refining*, 838 F.2d at 1136 (citing *In re Ford*, 36 B.R. 501, 504 (Bankr. W.D. Ky. 1983)). Where cause exists, a court is required to appoint a trustee pursuant to 11 U.S.C. § 1104(a)(1). *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (recognizing that § 1104(a) "mandates appointment of a trustee when the bankruptcy court finds cause").

64. Global submits that the conduct outlined here committed by Mr. Alf clearly meets all four elements of the "for cause" test (only one of which is actually required).

**Mr. Alf's Fraud and Dishonesty Satisfies the For Cause Test**

65. Mr. Alf's fraud and dishonesty existed prior to the petition and have carried through into the bankruptcy case.

66. Pre-petition acts, which the court is permitted to consider in examining whether there is "cause," are also a good predictor of future acts. People rarely change behavior. Mr. Alf is no exception. He is behaving in the bankruptcy case exactly as he did outside of bankruptcy.

67. Mr. Alf's participation in the felony conviction resulting in a $28M fine is just the starting point for his fraud and dishonesty which has continued through the case and will extend into the future if he is not stopped.

68. Mr. Alf's company (of which he is the sole shareholder) was subject to the largest fine ever paid in the Western District of New York, some $28M. Overbilling the government and taxpayers is the very essence of dishonesty. Having your company convicted of a felony is also not a best business practice.

69. But Mr. Alf did not stop at the Petition Date. He continued his fraud post-petition. For example, when he realized that the trademark he needed for his Non-Debtor

Affiliate was owned by the Debtor, he could have asked his bankruptcy counsel to petition the Court to transfer the mark for proper consideration. He could have chosen honesty and transparency.

70. But Mr. Alf chose the dishonest path, simply registering the new trademark on behalf of the Non-Debtor Affiliate and then canceling the trademark owned by the Debtor. And he thought he would get away with it. That is the very essence of fraud and dishonesty. If the only check on your actions is whether or not you get caught, you are dishonest. Mr. Alf is the poster child for dishonesty.

71. When it came to paying his wife for her no-show job but not paying creditors, Mr. Alf thought nothing of it. And this conduct continued post-petition, even after Global and the Committee pointed out to Mr. Alf that what he was doing was improper. He simply does not care.

72. Mr. Alf's fraud and dishonesty have been detailed at length. This improper conduct more than satisfies the fraud and dishonesty standard to appoint a Chapter 11 Trustee for cause.

**Mr. Alf's Incompetence and Gross Mismanagement Satisfies the For Cause Test**

73. Both the pre- and post-petition conduct of Mr. Alf and his hand-picked people rise to the level of incompetence and gross mismanagement sufficient to support a finding of 'cause' to replace them.

74. Mr. Alf has taken the Debtor down the road to ruin while systematically abandoning his duties. He has appointed officers that have no business operating the Debtor. The new CRO/CFO moonlights in the Colorado pot industry and does not even appear to work

on site. He has signed under penalty of perjury monthly operating reports that have errors into the millions of dollars. That is the very essence of incompetence.

75.     Another officer appointed by Mr. Alf is his wife, who has no expertise in air cargo and does not even appear to actually provide any services to the Debtor. In fact, she appears to be jeopardizing the very government contracts upon which the Debtor relies by her outrageous conduct described in the Florida Litigation. It is gross mismanagement when your personal conduct jeopardizes the very government contracts you depend on.

76.     Despite being advised by the Office of the United States Trustee that operating reports must be filed timely, the Debtor continually fails to satisfy this obligation and files them only when demanded by Global and the Committee. Having three CFOs during the pendency of this case certainly cannot help and likely indicates a conflict with Mr. Alf regarding management and finance issues. Constant turnover of the CFO positon indicates a problem beyond the CFO; it indicates overall incompetence and mismanagement.

**D.      The Interest of Creditors Warrants Immediate Appointment of a Chapter 11 Trustee**

77.     Courts have recognized that the interests of the creditors test under § 1104(a)(2) is a flexible standard which gives courts wide discretion to appoint a trustee even when no cause exists. *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008). In determining whether a trustee should be appointed "in the interests of creditors," courts "look to practical realities and necessities." *Id.* at 112 (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)).

78.     The Court need not find cause in order to appoint a trustee. Pursuant to § 1104(a)(2), the Court has wider discretion and the standards are even more flexible than those under § 1104(a)(1). *See In re Oklahoma Refining*, 838 F.2d at 1136 ("[i]t is clear, both from the

language of the statute and established case law, that the court need not find any of the enumerated wrongs in order to find cause for appointing a trustee … It is sufficient that the appointment be in the interest of creditors.") (internal citation omitted). *See also In re Bellevue Place*, 171 B.R. at 623; *In re Colo.-Ute Elec. Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) ("As to whether the appointment of a trustee is in the best interest of creditors pursuant to Section 1104(a)(2), the court should eschew rigid absolutes and look to the practical realities and necessities.") (internal quotations omitted) (citation omitted). Indeed, it is enough that appointment of a Chapter 11 Trustee is in the "interest of the estate generally, which can mean that there may be competing interests that weigh for and against the appointment." *In re Sanders*, No. 99 B 9876, 2000 WL 329574, at *5 (Bankr. N.D. Ill. Mar. 2, 2000).

79. "Section § [sic] 1104(a)(2) envisions a flexible standard and gives the … court discretion to appoint a trustee when doing so would serve the parties' and estate's interests." *In re 1031 Tax Group*, 374 B.R. at 90 (citing *In re Marvel Entm't*, 140 F.3d 463, 474 (3d. Cir. 1998) (internal quotations omitted)). Even if the Court does not find that cause exists to appoint a Chapter 11 Trustee under § 1104(a)(1), the Court may still appoint a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2).

80. Courts typically consider the following factors to determine whether the appointment of a trustee is warranted under the "interests of creditors" standard set forth in § 1104(a)(2) of the Bankruptcy Code: (a) the trustworthiness of the debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the confidence, or lack thereof, of creditors in present management; (d) doubt as to whether the debtor's current management could be considered loyal to the debtor's rehabilitation; (e) depletion of the estate assets and

impairment of secured creditors' interests; (f) questionable post-petition expenditures; and (g) inherent conflicts on the part of debtors-in-possession in carrying out their fiduciary responsibilities. *In re Ionosphere Clubs*, 113 B.R. 164.

In the instant case, each *Ionosphere* factor supports appointment of a Chapter 11 Trustee:

a. Trustworthiness of the Debtor: The fact that the FBI did not find the Debtor and its management trustworthy is a good indication of a problem. The fact that the federal government brought criminal charges is an even better indication of a lack of trustworthiness. The fact that the Debtor pleaded guilty and paid the largest fine ever is perhaps the best indication. Combine that with stealing the Debtor's intellectual property after the Petition Date and it is evident as to why trust is at the lowest point possible.

b. Past and Present Performance and Depletion of Estate Assets: The Debtor first claimed that the bankruptcy was Global's fault and without Global's Judgment, everything was fine. Considering that more than two and a half years have passed since the Petition Date and the Debtor continues to lose money and has not even attempted to confirm a plan, this appears untrue. Despite obtaining a breathing spell from paying on the Judgment (and all of its other pre-petition debts), the Debtor has made no progress toward a plan and cannot even pay its own attorneys. The Debtor is administratively insolvent. The last two months of operating reports show losses of nearly $2M. The Debtor is in a tailspin.

c. Creditors' Confidence: Global, which represents the vast majority of the claims pool, has been patient with the Debtor, but the case is now in its third year. Global's (and likely every other creditor's) confidence in the Debtor and Mr. Alf is zero. A Chapter 11 Trustee is now the right step.

d. Loyalty of Management and Questionable Post-Petition Expenditures: Paying your wife for a no-show job is the very essence of a lack of loyalty toward creditors. Paying yourself before paying administrative expenses when you told the United States Trustee the exact opposite demonstrates serious management deficiencies. Stealing intellectual property is icing on the cake (and not the good kind). Having gone through three CFOs in the case shows the loyalty of officers as well as Mr. Alf.

e. Inherent Conflicts: Three conflicts have been illustrated at length herein (and if discovery commences on this Motion, it is likely to be the tip of the iceberg). Whether it be Mr. Alf transferring the Debtor's property to a Non-Debtor Affiliate, the debacle involving the U.S. Marshal, or paying his wife for a no-show job, there are significant conflicts between the Debtor and Non-Debtor Affiliates; conflicts which Mr. Alf simply does not plan to address. As a result the Debtor loses. It is time for a Chapter 11 Trustee to right the ship.

81. The most important factor to consider in the circumstances presented here is the benefit to the estate balanced against potential harm to the Debtor and Mr. Alf, an analysis that tilts decidedly in favor of appointing a Chapter 11 Trustee.

82. Global submits that the appointment of a Chapter 11 Trustee is clearly in the interests of the creditors.

## NOTICE

83. Notice of this Motion has been provided to: (a) counsel to the Debtor; (b) the United States Trustee for the Western District of New York; (c) the Official Committee of Unsecured Creditors; (d) counsel to the Non-Debtor Affiliates; (e) counsel to the Adversary Proceeding Defendants; and (f) all parties that have filed a notice of appearance in the case. It is respectfully submitted that no further notice is necessary.

## PRIOR REQUEST FOR RELIEF

84. No previous motion for relief sought herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, Global requests that the Court enter an Order directing the appointment of a Chapter 11 Trustee either for cause or in the interest of creditors and otherwise granting such other, further, and different relief as the Court may deem just and proper.

Dated: April 17, 2017

PERKINS COIE LLP
Attorneys for Global BTG LLC

By: */s/ Schuyler G. Carroll*

Schuyler G. Carroll, Esq.
Jeffrey D. Vanacore, Esq.
SCarroll@perkinscoie.com
JVanacore@perkinscoie.com
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112-0085
212.262.6900