**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

IN RE:

NATIONAL AIR CARGO, INC.,

    DEBTOR.

CHAPTER 11
CASE NO. 1-14-12414-MJK

---

## DEBTOR'S *FIRST AMENDED* DISCLOSURE STATEMENT FOR CONSENSUAL CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**LIPPES MATHIAS WEXLER FRIEDMAN, LLP**
Raymond L. Fink, Esq.
John A. Mueller, Esq.
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202
Telephone: (716) 853-5100
Facsimile: (716) 853-5199
rfink@lippes.com
jmueller@lippes.com

· *Counsel to Debtor and Debtor-in-Possession*

Dated: September 19, 2017

**DISCLAIMER**

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED SOLELY FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND ONE SHOULD NOT RELY UPON IT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

THE PLAN PROPONENTS ADVISE AND ENCOURAGE ALL CREDITORS TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF ANY FINANCIAL INFORMATION AND ANY DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS SHOULD NOT ASSUME AT THE TIME OF REVIEWING THE DISCLOSURE STATEMENT THAT THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT ARE UNCHANGED SINCE THE DATE OF THE DISCLOSURE STATEMENT.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE PLAN PROPONENTS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ANY FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT IS UNAUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE. ANY FINANCIAL ANALYSIS OR

PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND BEYOND THE CONTROL OF THE DEBTOR'S MANAGEMENT. THE PLAN PROPONENTS CAUTION THAT NO REPRESENTATIONS ARE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ULTIMATE PERFORMANCE OF THE REORGANIZED COMPANY COMPARED TO THE INFORMATION CONTAINED IN THE FORECASTS OR THAT THE FORECASTED RESULTS WILL BE ACHIEVED. THEREFORE, DO NOT RELY ON THE FINANCIAL PROJECTIONS AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH EACH WAS PREPARED. ONE SHOULD NOT CONSTRUE THIS DISCLOSURE STATEMENT AS ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR, AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATIONS OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTOR OR ANY OTHER PARTY, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS IN ACCORDANCE WITH FED. R. EVID. 408. AS SUCH, THIS DISCLOSURE STATEMENT IS NOT ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHOULD ONE CONSTRUE IT AS CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR OR ANY OTHER PARTY IN INTEREST.

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...................................................................................................... 1

    A.   Overview of Chapter 11 ................................................................................ 2
    B.   Rules of Interpretation and Construction ..................................................... 2
    C.   Recommendation of the Committee ............................................................. 3
    D.   Recommendation of the Debtor ................................................................... 3
    E.   Support of Global ......................................................................................... 3

II.  HISTORY OF THE DEBTOR ................................................................................. 3

    A.   Organization ................................................................................................. 3
    B.   Operations .................................................................................................... 4

III. BANKRUPTCY ...................................................................................................... 5

    A.   Events Leading to Chapter 11 ...................................................................... 5
    B.   Voluntary Petition Filing ............................................................................. 6

IV.  SIGNIFICANT EVENTS DURING BANKRUPTCY ........................................... 6

    A.   Petition Date ................................................................................................. 6
    B.   Administration .............................................................................................. 6
    C.   First Day & Related Orders .......................................................................... 7
    D.   Retention & Employment of Professionals .................................................. 7
    E.   Appointment of Committee .......................................................................... 7
    F.   Schedules and Statements ............................................................................ 7
    G.   Rejection of Executory Contracts ................................................................ 8
    H.   Claims Bar Date ........................................................................................... 8
    I.   Claims Register ............................................................................................ 8
    J.   Global Claim ................................................................................................ 8
    K.   Committee Litigation ................................................................................... 8
    L.   Pending Motions for Appointment of a Chapter 11 Trustee or to Convert ........... 9
    M.   Pending Lift Stay Motion ........................................................................... 10

V.   PLAN – SUMMARY & TERMS .......................................................................... 11

    A.   Overall Structure ........................................................................................ 11
    B.   Reorganized Company ................................................................................ 11
    C.   Classification & Treatment of Claims ........................................................ 12
    D.   Voting Procedures and Requirements ........................................................ 17
    E.   Means for Implementation .......................................................................... 21
    F.   Actions Necessary and Appropriate .......................................................... 24
    G.   Incentive Plans & Employee/Retiree Benefits .......................................... 25
    H.   Event of Default ......................................................................................... 25
    I.   Intercompany Claims .................................................................................. 26
    J.   Distributions ............................................................................................... 26
    K.   Procedures for Disputed Claims ................................................................ 29
    L.   Executory Contracts and Unexpired Leases .............................................. 30
    M.   Conditions Precedent to Effective Date .................................................... 32

| | N. | Effect of Confirmation | 33 |
|---|---|---|---|
| | O. | Modification, Revocation or Withdrawal of Plan | 39 |
| | P. | Retention of Jurisdiction | 39 |
| | Q. | Miscellaneous Provisions | 39 |
| VI. | | RISKS AND CONSIDERATIONS | 43 |
| | A. | Bankruptcy Considerations | 43 |
| | B. | No Duty to Update Disclosures | 44 |
| | C. | Representations Outside this Disclosure Statement | 45 |
| | D. | No Admission | 45 |
| VII. | | CONFIRMATION | 45 |
| | A. | Plan Confirmation Hearing | 45 |
| | B. | General Requirements | 45 |
| | C. | Plan Consummation | 47 |
| | D. | Separate Classification | 47 |
| | E. | Acceptance by Impaired Classes | 48 |
| | F. | Cramdown | 48 |
| | G. | Feasibility | 50 |
| | H. | Best Interests Test | 51 |
| | I. | Liquidation Analysis | 51 |
| VIII. | | INCOME TAX CONSEQUENCES | 52 |
| | A. | Certain United States Federal Income Tax Consequences to Holders of Allowed Claims | 53 |
| | B. | Certain United States Federal Tax Consequences to the Debtor | 55 |
| IX. | | ALTERNATIVES TO PLAN | 55 |
| | A. | Liquidation Under Chapter 7 | 55 |
| | B. | Alternative Plan of Reorganization | 56 |
| | C. | Dismissal of the Debtor's Chapter 11 Case | 56 |
| X. | | RECOMMENDATION AND CONCLUSION | 56 |

# I. INTRODUCTION

On October 17, 2014 (the "Petition Date"), National Air Cargo, Inc. (the "Debtor"), filed a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court"). The Debtor has continued in possession and management of its property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

This Disclosure Statement was prepared in conjunction with the *Consensual Chapter 11 Plan of Reorganization Proposed by the Debtor and the Official Committee of Unsecured Creditors* (the "Plan"), which is attached hereto as **Exhibit A**.[1] The Plan is proposed by the Debtor and the Official Committee of Unsecured Creditors (the "Committee", together with the Debtor, the "Plan Proponents") and supported by Global BTG LLC, the Debtor's largest creditor ("Global"). All references to the Plan or particular provisions thereof are qualified in their entirety by reference to the Plan. In conjunction with the Committee, the Debtor has prepared, filed, and served this Disclosure Statement, including any attached and/or accompanying exhibits, which are incorporated herein by reference, to the Holders of all known Claims against the Debtor and all other parties in interest pursuant to Section 1125(b) of the Bankruptcy Code, unless otherwise set forth herein.

This Disclosure Statement seeks to provide to the claimants such material information as is necessary to enable a hypothetical reasonable investor typical of the Holders of Claims to make a reasonably informed judgment about the Plan and to arrive at an informed decision in exercising its right to vote to accept or reject the Plan.

The Plan Proponents urge you to review the Disclosure Statement and Plan with your legal counsel. If the Bankruptcy Court confirms the Plan, it will constitute a legally binding contract and the terms and treatment set forth therein will be binding upon each claimant, whether or not the claimant votes on the Plan. In the case where the Bankruptcy Court receives more than one timely and properly completed Ballot by a creditor, it will only count the Ballot that bears the latest date and time for purposes of voting tabulation.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a verification of the accuracy or completeness of the information contained herein, nor does it constitute an endorsement of the Plan.

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS URGE YOU TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED FOR USE IN CONNECTION WITH THE PLAN. NO SOLICITATION FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

1

THE PLAN PROPONENTS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN.  IT IS THE OPINION OF THE PLAN PROPONENTS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH THEY ARE LIKELY TO ACHIEVE UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

**A.**     *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, Chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the Chapter 11 case.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a Chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed Chapter 11 plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of Section 1125 of the Bankruptcy Code.

**B.**     *Rules of Interpretation and Construction*

Unless otherwise specified, all section or exhibit references in the Disclosure Statement are to the respective section in, or exhibit to, the Disclosure Statement, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Disclosure Statement as a whole and not to any particular section, subsection, or clause contained therein.  The rules of construction contained in Section 1102 of the Bankruptcy Code shall apply to the Disclosure Statement.  The headings in this Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the interpretation of the Disclosure Statement.  Unless otherwise provided, any reference in this Disclosure Statement to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified.  Further, where appropriate from a contextual reading of a term, each term

includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In computing any period of time set forth in the Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

## C.     *Recommendation of the Committee*

The treatment embodied in the Plan with respect to the Claims of the unsecured creditors of the Debtor was extensively negotiated by the Committee, through its counsel and financial advisor, with the Debtor and its respective advisors. The Plan implements the settlement reached by the parties. In light of these negotiations and settlement, it is the Committee's view that the Plan is the best available means at this time to maximize value for unsecured creditors. Accordingly, the Committee supports the Plan and urges all unsecured creditors to vote in favor of the Plan.

## D.     *Recommendation of the Debtor*

The Debtor believes that the treatment of creditors under the Plan contemplates a greater recovery than that which they are likely to achieve under other alternatives for the reorganization or liquidation of the Debtor; that the Plan accomplishes the objectives of Chapter 11 of the Bankruptcy Code; and that acceptance of the Plan is in the best interests of the Debtor, its creditors, the Estate, and all parties in interest. Accordingly, the Debtor urges creditors to vote to accept the Plan.

## E.     *Support of Global*

Global, the Debtor's largest unsecured creditor by a substantial margin, has been active in this Chapter 11 Case from its inception. The treatment embodied in the Plan with respect to the Global Claim was extensively negotiated by Global, through its counsel, and the Debtor and its representatives. The Plan implements the settlement reached between the parties. Accordingly, Global supports the Plan.

## II. HISTORY OF THE DEBTOR

## A.     *Organization*

The Debtor is a New York registered corporation headquartered in Orchard Park, New York, which was at the time of filing, and is currently, wholly owned by National Air Cargo Holdings, Inc., a Florida corporation ("National Holdings"), which is wholly owned by Christopher J. Alf ("Mr. Alf"). As of the Petition Date, the Debtor had a total of 80 employees, including 56 based in Western New York.

As part of a global business, the Debtor has historically operated as an air-based freight forwarder for cargo originating from, or destined for, North and South America.[2] The Debtor

---

[2] Its sister companies provide similar services in other regions of the world. The Debtor and its Non-Debtor Affiliates operate within a unique space in the freight forwarder section as the vast majority of their shipments are, directly or indirectly, for the United States Department of Defense, as discussed more herein.

Case 1-14-12414-MJK,   Doc 833,   Filed 09/21/17,   Entered 09/21/17 11:49:35,   Description: Main Document  , Page 8 of 66

has functioned as an intermediary that facilitates the movement of cargo through: (i) the utilization of aircraft from various sources, including corporate affiliates and other commercial carriers; and (ii) other modes of transportation over the roads, railways and oceans.

Historically, the majority of the freight forwarding services were for the shipment of supplies, armaments and other military related goods pursuant to prime contracts held by third parties with the United States Department of Defense ("DOD"). The Debtor facilitated shipments for customers in conjunction with its foreign-based affiliates where the subject cargo either originated from or was destined to locations outside of the Americas (*i.e.* Europe, the Middle East, Africa and/or the Pacific).

An affiliated entity, National Air Cargo Group, Inc. d/b/a National Airlines ("National Airlines"), a wholly owned subsidiary of NAC Acquisitions LLC, is a Part 121 carrier and registered member of the Civil Reserve Air Fleet specializing in time-sensitive and heavy-lift domestic and international cargo solutions under contracts with the DOD. The DOD contracts directly with National Airlines, who in turn subcontracts with the Debtor to provide mission-critical logistics support through the timely delivery of essential supplies and materials that keep military operations running uninterrupted. National Airlines' military-related operations for the DOD have historically accounted for approximately eighty percent (80%) of the Debtor's revenues.

## B. *Operations*[3]

In the ordinary course of business, the Debtor and its non-debtor affiliates (the "Non-Debtor Affiliates", together with the Debtor, the "National Group") systematically received and disbursed funds thorough a centralized cash management system and allocated costs and expenses pursuant to a Global Transfer Pricing Policy dated March 2010 (the "Transfer Pricing Policy").[4] The Transfer Pricing Policy memorializes the profit sharing model implemented in 2002, at or about the time the first foreign freight forwarder, National Air Cargo GmbH, was formed, and dictates protocols for the allocation of revenues, expenses and profits/losses among the Debtor and various Non-Debtor Affiliate freight forwarders.[5]

The Debtor is solely responsible for all logistics on the U.S.-based side of the global transactions (ground transportation, airline booking, etc.). For example, the Debtor arranges for

---

[3] The narrative set forth in this section, which describes the Debtor's operations and interactions with its Non-Debtor Affiliates, is in the Debtor's own words. While the Committee defers to the Debtor with respect to the information set forth in this section for the purposes of this Disclosure Statement, it does not, by implication or otherwise, take a position with respect to the content of this section.

[4] A true and correct copy of the Transfer Pricing Policy is filed as *Exhibit A* to Docket No. 555 (Declaration of Eric Danat Clarifying Debtor's Relationships with Non-Debtor Affiliates and Parent Companies).

[5] Among other things, the Transfer Pricing Policy references and adopts various methodologies and protocols to establish intercompany pricing for services rendered in accordance with country specific and market rate requirements. The Transfer Pricing Policy, as well as the domestic and foreign taxing jurisdictions, require the Debtor to maintain accounting and financial records to document the allocation of revenues, expenses and profits/losses on a transaction-by-transaction basis.

4

all of the cargo logistics when the point of origin is in North America to the point where the cargo departs the North American continent. Once the cargo is airborne or on the ocean, the logistical services shift to an overseas affiliate of the Debtor that provides similar services to the point of destination.

The Debtor and destination affiliate split profits and losses 50/50. Allocation is predicated upon the determination that each provides equal services and effort to successful completion of the delivery. If the transportation originates and ends in the Debtor's region of North and South America, the Debtor retains one-hundred percent (100%) of the profits (or losses). Otherwise, the affiliate in the destination region invoices the Debtor the amount necessary to achieve the 50/50 profit split. The Debtor, in turn, records a receivable due from National Airlines equal to the amount invoiced to the customer.

Post-petition continuity of the intercompany relationships and ordinary course transactions were vital to the Debtor's continued operations. Accordingly, post-petition ordinary course Intercompany Transactions[6] were approved by final order of the Bankruptcy Court on January 27, 2015. *See* Docket No. 171.

The Debtor and its affiliates scrupulously track and account for all Intercompany Transactions and each maintains its own bank accounts and separate financial records, consistent with proper protocols required to maintain the legal and operational separation between affiliates.

### III. BANKRUPTCY

A.      *Events Leading to Chapter 11*

The Debtor's reliance upon military contracts was largely responsible for its financial successes throughout the 2000s, as DOD spending and operations overseas were at historically high levels. However, beginning late in 2012, several external factors adversely affected the Debtor's operations and finances.

Starting in 2008, the steady withdrawal of U.S. military personnel from the Middle East curtailed the DOD's need for freight forwarding services, particularly when compared to the peak of U.S. military involvement in Iraq and Afghanistan. Fewer troops and other personnel on the ground meant a reduced need for supplies and other cargo. Concurrent with the DOD's continued Middle East scale down, the federal government's budget sequestration affected the economy, with severe ramifications throughout all defense-related industries. Due to the DOD's Middle East scale down and overlay of the federal budget sequestration, the Debtor had to lay off approximately fifteen percent (15%) of its employees and implemented other cost-saving measures to offset the adverse financial impact.

For calendar years ending 2012 through 2014, the Debtor's balance sheet reflected negative equity of $34,500,000 (assets of $7,800,000 less liabilities of $42,300,000), $31,000,000 (assets of $8,200,000 less liabilities of $39,200,000), and $23,000,000 (assets of

---

[6] The ordinary course intercompany transactions between the Debtor and non-debtor affiliates are collectively defined as the "Intercompany Transactions." *See* Docket Nos. 3 and 171

$2,800,000 less liabilities of $25,800,000), respectively.

The aforementioned financial circumstances alone would not have necessitated the Debtor to seek relief under chapter 11 of the Bankruptcy Code.  In February 2011, Global sued the Debtor for breach of contract ("Global Litigation") in the United States District Court for the Central District of California (the "CA District Court").  At the conclusion of a jury trial and after consideration of post-trial motions, on or about April 24, 2014, the CA District Court entered an amended judgment in favor of Global and against the Debtor for $9,927,232.00 ("Global Judgment").  In the months leading up to the Debtor's bankruptcy filing, Global instituted enforcement proceedings in various jurisdictions.  Of immediate concern and potential detriment to the Debtor's operations was the 'Notice of Levy under Writ of Execution' issued by Global against the Debtor's primary operating account, which resulted in the restraint of over $500,000 of the Debtor's funds.

The Debtor explored the prospects for filing an appeal bond, but it was cost prohibitive.  Consistent with its fiduciary duties, the Debtor filed this Chapter 11 Case to preserve its assets, maintain business operations critical to the United States' military interests, and insure fair and equitable treatment for all of its creditor constituents, while at the same time pursuing an appeal of the Global Judgment to the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit").  If Global were not stayed from pursuing its enforcement actions, the Debtor believes all of its other creditors would have suffered irreparable harm.

Since the Petition Date, the Ninth Circuit has affirmed the Global Judgment and the resulting Claim (*i.e.* the Global Claim) will be deemed Allowed pursuant to the Plan.

**B.**     *Voluntary Petition Filing*

Global's judgment enforcement proceedings, which were a real and significant threat to the Debtor's viability and any hope for a financial turnaround, precipitated this Chapter 11 Case.  The Bankruptcy Code's automatic stay prevented Global from continuing to seize the assets of the Debtor, to the detriment of all other creditors, while it prosecuted its appeal of the Global Judgment and otherwise worked toward improving its operations and financial performance.

The absence of several common bankruptcy issues and constituencies strengthened the Debtor's potential for successful reorganization; namely, no real property, secured creditors or known outstanding tax obligations as of the Petition Date.

## IV. SIGNIFICANT EVENTS DURING BANKRUPTCY

**A.**     *Petition Date*

On October 17, 2014 (*i.e.* the Petition Date), the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

**B.**     *Administration*

After the Petition Date, and in accordance with Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continued to operate its businesses and manage its property as

a debtor-in-possession.  No trustee or examiner has been appointed in the Chapter 11 Case.

## C.    *First Day & Related Orders*

The Bankruptcy Court entered certain orders early in the case designed to minimize the disruption of the Debtor's business operations and to facilitate its reorganization.  In particular, the Debtor obtained orders authorizing:  (i) ordinary course Intercompany Transactions; (ii) use of existing bank accounts and business forms; (iii) payment of pre-petition wages, compensation, and employee benefits; (iv) payment to certain critical vendors; and (v) payment of utility providers.

## D.    *Retention & Employment of Professionals*

During the Chapter 11 Case, the Debtor sought and obtained authority to retain and employ the following professionals to assist in the administration of the Debtor's Chapter 11 Case:  (i) Harter Secrest & Emery LLP ("Harter Secrest") as primary bankruptcy counsel to the Debtor; (ii) Mesirow Financial Consulting, LLC ("Mesirow") as financial advisor to the Debtor; (iii) Jenner & Block LLP and Phillips Lytle LLP as special counsel to the Debtor, to provide certain legal services to the NAC Group in connection with ongoing litigation; (iv) Huron Consulting Services LLC ("Huron"), which succeeded Mesirow as financial advisor to the Debtor; and (v) Lippes Mathias Wexler Friedman, LLP, which succeeded Harter Secrest as primary bankruptcy counsel to the Debtor.

## E.    *Appointment of Committee*

On or about November 7, 2014, the Office of the United States Trustee for the Western District of New York (the "UST") appointed the Committee pursuant to Section 1102(a) of the Bankruptcy Code.  The Committee's current members are:  (i) Guthrie Trucking/Brokerage, LLC ("Guthrie"); (ii) Ground Force LLC; (iii) DC Dyna, Inc.; (iv) Key Air LLC; and (v) Global. Following its formation, the Committee selected the law firm of Pachulski Stang Ziehl & Jones LLP as its counsel and Province, Inc. as its financial advisor.  The chairperson of the Committee is Warren Guthrie of Guthrie (the "Committee Chair").

## F.    *Schedules and Statements*

On November 21, 2014, the Debtor filed its schedules of assets and liabilities and statements of financial affairs [Docket. No. 68] (collectively, and as amended, the "Schedules"). On January 30, 2015, and October 14, 2016, respectively, the Debtor filed its amended Schedules [Docket. Nos. 187 and 628].

Global brought to the attention of the Debtor that it listed the wife of Mr. Alf, Lori Alf ("Mrs. Alf, together with Mr. Alf, the "Alfs"), on its Schedules as an officer of the Debtor. Unfortunately, this was in error.  Mrs. Alf is not, and never has been, an officer of the Debtor. This Disclosure Statement is intended to act as an amendment to the Schedules to reflect the correction.

7

## G. **Rejection of Executory Contracts**

Pursuant to an order of the Bankruptcy Court dated January 27, 2015 [Docket. No. 168], the Debtor rejected three (3) Executory Contracts identified in Schedule G: (i) Braxton Acquisitions, LLC – aircraft lease agreement [U.S. Registration #N539CA]; (ii) LA 45 Equipment, LLC – aircraft lease agreement [U.S. Registration #N595LA]; and (iii) Signature Flight Support Corporation – aircraft hangar lease.[7]

## H. **Claims Bar Date**

By order of the Bankruptcy Court dated March 16, 2015 [Docket. No. 221], the Bankruptcy Court fixed the Claims Bar Date of April 30, 2015 as the deadline for claimants to file Proofs of Claim.

## I. **Claims Register**

According to the claims register for this Chapter 11 Case, there are approximately $12.4 million of scheduled and asserted General Unsecured Claims against the Debtor in its Bankruptcy Case.[8] Unless otherwise provided in the Plan, all Claims are still subject to review, reconciliation and potential objections by the Debtor.[9] The Plan provides that the Claims Objection Deadline for General Unsecured Claims is the Confirmation Date.

## J. **Global Claim**

Approximately $10 million of the aggregate pool of General Unsecured Claims against the Debtor relates to the Global Claim. *See* Proof of Claim No. 57. The Global Claim is based on the Global Judgment, which has been affirmed by the Ninth Circuit. The Global Claim is deemed Allowed pursuant to the Plan.

## K. **Committee Litigation**

On August 19, 2016, the Committee filed its *Motion of the Official Committee of Unsecured Creditors of National Air Cargo, Inc. Pursuant to 11 U.S.C. §§ 105(a), 1103(c), and 1109(b) for Entry of an Order Granting Leave, Standing, and Authority to Prosecute Certain Insider and Chapter 5 Cause of Action on behalf of the Debtor and its Estate* [Docket. No. 515] ("STN Motion"), seeking, *inter alia*, standing on behalf of the Debtor to commence and prosecute chapter 5 avoidance actions against certain non-debtor affiliates of the Debtor, as well as against third-parties, and claims against the current and former officers and directors of the Debtor. On August 23, 2016, the Bankruptcy Court entered a so-ordered stipulation granting the

---

[7] The counterparties have since assigned these contracts to non-debtor affiliates and waived any 'rejection damages' claims against the Debtor's Estate.

[8] This does not take into consideration (i) Intercompany Claims, which are not receiving any specific distribution under the Plan, or (ii) any reduction on account of critical vendor payments made by the Debtor pursuant to Orders of the Court.

[9] The Debtor is also reviewing the propriety of scheduled claims to determine whether any amendments to the Schedules are necessary.

8

STN Motion [Docket. No. 537].

In October 2016, the Committee filed a complaint [AP Docket. No. 1] (the "Complaint") against the Non-Debtor Affiliates, the Alfs and other persons alleged to be current and former officers and directors of the Debtor, thereby initiating Adv. Pro. No. 16-01081 (MJK) (the "Committee Litigation"), which is pending in the Bankruptcy Court. Defendants Chris Alf, Lori Alf, Jacob Matthew and the Non-Debtor Affiliates (collectively, the "National Defendants") moved to dismiss the Complaint on January 17, 2017 [AP Docket. No. 29] (the "National Defendants' Initial Motion to Dismiss"). Defendants Brian Conaway, Glen Joerger, John Baker, Preston Murray, Robert D. Bishop, Jr., Shirley Kaufman and William Mortensen (collectively, the "Individual Defendants") moved to dismiss the Complaint on January 23, 2017 [AP Docket. No. 38] (the "Individual Defendants' Initial Motion to Dismiss", together with the National Defendants' Initial Motion to Dismiss, the "Initial Motions to Dismiss"). The Committee amended the Complaint on February 28, 2017 in response to the Initial Motions to Dismiss [Docket. No. 58] (the "Amended Complaint"). Thereafter, both the National Defendants and the Individual Defendants moved to dismiss the Amended Complaint [Docket. Nos. 60 and 61] (together, the "Motions to Dismiss"). The Motions to Dismiss are currently pending, but have been adjourned in light of the global settlement among the parties.

The Committee has also initiated Avoidance Actions against a number of third parties (collectively, and together with the Committee Litigation, the "Adversary Proceedings"), which are at varying stages of litigation.

As part of the global settlement that encompasses the Plan, all Adversary Proceedings brought by the Committee, including the Committee Litigation, will be dismissed with prejudice on the Effective Date, as discussed in more detail in Article V(N)(13) of this Disclosure Statement.

**L.**  ***Pending Motions for Appointment of a Chapter 11 Trustee or to Convert***

On April 17, 2017, Global filed its *Motion of Global BTG LLC for Appointment of a Chapter 11 Trustee* [Docket. No. 710] (the "Motion to Appoint"), seeking the appointment of a chapter 11 trustee in this Chapter 11 Case. On April 26, 2017, the Committee filed a joinder [Docket. No. 725] to Global's Motion to Appoint ("Joinder").

On May 1, 2017, UST filed its *Motion to Convert the Debtor's Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket. No. 731] (the "Motion to Convert"), seeking conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or, in the alternative, for the appointment of a chapter 11 trustee.

In its Motion to Appoint, Global makes a number of allegations with respect to the Debtor and Alfs, including with respect to purported fraudulent conduct and mismanagement. In its Motion to Convert, the UST incorporates by reference some of the allegations raised by Global in is Motion to Appoint. The global resolution of this Chapter 11 Case embodied in the Plan resolves and/or moots the Motion to Appoint, Joinder and Motion to Convert, among other outstanding matters.

Notwithstanding, the Alfs and Non-Debtor Affiliates believed that it was prudent to

briefly address on the record the allegations made by Global and the UST in their respective motions. To that end, on July 28, 2017, the Alfs and Non-Debtor Affiliates filed an *Omnibus Statement in Response to Pending Motions* [Docket. No. 802].

**M.**      ***Pending Lift Stay Motion***

On April 17, 2017, Global also filed its *Motion of Global BTG LLC for Relief from the Automatic Stay or for a Determination that the Stay Does Not Apply* [Docket. No. 711] ("Lift Stay Motion"), seeking relief from the stay, or a determination that it is not applicable, to permit it to amend the Global Judgment to include Non-Debtor Affiliates. The Debtor believes that the Lift Stay Motion would ultimately be unsuccessful. Nevertheless, the global resolution of this Chapter 11 Case embodied in the Plan resolves and/or moots the Lift Stay Motion.

**N.**      ***Post-Petition Operations***

The Debtor continues to operate its business and manage its properties as debtor and debtor-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and has done so since the Petition Date. Between October 2014 and June 2017, the Debtor had negative net income of approximately $800,000. However, in comparing the pre and post-petition years, the Debtor's operations and finances have stabilized. Further, the bankruptcy process has allowed the Debtor to streamline certain operations and reduce substantial liabilities, including costly leases and executory contracts. This 'stabilization' of the Debtor is best evidenced by the retention of employees, but most importantly, the fact that no post-petition financing was ever necessary to maintain the Debtor's ongoing operations.

## V. PLAN – SUMMARY & TERMS

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO, OR FILED IN ACCORDANCE WITH ANY APPLICABLE DEADLINE.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR AND OTHER PARTIES IN INTEREST.

### A. *Overall Structure*

Under the Plan, Claims against, and Interests in, the Debtor are divided into five (5) Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated: (i) Holders of Allowed Claims in Class 1 (Other Priority Claims) will receive distributions equal to the full amount of such Allowed Claims; (ii) Holders of Allowed Claims in Classes 2 and 3 (Unsecured Global Claim and Other Unsecured Claims) will receive distributions constituting a partial recovery on such Allowed Claims; (iii) Holders of Allowed Claims in Class 4 (Intercompany Claims) will not receive a specific distribution under the Plan on account of such Allowed Claims, but such Claims will ride through the Chapter 11 Case unaltered, provided, however, that no Intercompany Transaction shall impair the Disbursing Entities' ability to make any payments contemplated under the Plan; and (iv) Holders of Interests in Class 5 (Shareholder Interests) will retain such Interests on account of the New Value Contribution made by National Holdings and the Disbursing Entities. On the Effective Date and at certain times thereafter, the Disbursing Entities will distribute Cash to Holders of certain Classes of Claims as provided in the Plan. Details of the Classes of Claims against the Debtor created under the Plan and their treatment are set forth below.

### B. *Reorganized Company*

The Reorganized Company, which shall continue to carry on the business of the Debtor, will consist of reorganized Debtor. For operating the Reorganized Company, the Plan shall not alter the composition, members or terms of members of the board of directors of the Debtor.

11

Except as otherwise provided in the Plan, the existing officers and directors of the Debtor shall serve in their current capacities in the Reorganized Company. The officers of the Debtor include: Mr. Alf, President and Chief Executive Officer and Michael Tew, Treasurer. The sole director of the Debtor is Mr. Alf. Mr. Alf is the sole shareholder of National Holdings, which is the sole shareholder of the Debtor. Mr. Alf was removed from the Debtor's payroll effective May 2017, but the Debtor reserves the right to place him back at a future date, if circumstances warrant. From and after the Effective Date, each director or officer of the Reorganized Company shall serve pursuant to the terms of the respective charters and bylaws or other constituent documents, and applicable state corporation law.

## C.   *Classification & Treatment of Claims*

The following table designates the Classes of Claims and Interests against the Debtor and specifies whether each such Class is: (i) Impaired or Unimpaired by the Plan; and (ii) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code. The table also designates, where applicable, those Classes deemed to reject the Plan in accordance with Section 1126 of the Bankruptcy Code. The Bankruptcy Code provides that Unimpaired Classes are conclusively presumed to accept the Plan, and therefore, solicitation of acceptance from such Classes is not required.

A Claim is placed in a particular Class only to the extent that such Claim falls within the designation of that Class, and is classified in other Classes to the extent that any portion of the Claim falls within the designation of such other Classes.

| Class | Designation | Treatment | Entitled to Vote | Entitled Range of Recovery under the Plan |
|-------|-------------|-----------|------------------|-------------------------------------------|
| --- | Administrative Claims | Payment in full or consent to other treatment | No | 100% |
| --- | Professional Claims | Payment in full or consent to other treatment | No | 100% |
| --- | Priority Tax Claims | Payment in full or consent to other treatment | No | 100% |
| --- | United States Trustee Fees | Payment in full or consent | No | 100% |

12

| Class | Designation | Treatment | Entitled to Vote | Entitled Range of Recovery under the Plan |
|---|---|---|---|---|
| | | to other treatment | | |
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) | 100% |
| 2 | Unsecured Global Claim | Impaired | Yes | 88% - 94% |
| 3 | Other Unsecured Claims | Impaired | Yes | 60% - 94% |
| 4 | Intercompany Claims | Unimpaired | No (Presumed to Accept) | Claims Ride Through |
| 5 | Shareholder Interests | Unimpaired | No (Presumed to Accept) | Interests Retained |

1.     **Treatment of Unclassified Claims and Interests under the Plans**

a.     **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or Reorganized Company, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to 28 U.S.C. § 1930) will receive in full and final satisfaction of its Administrative Claim an amount of Cash from the Disbursing Entities equal to the amount of such Allowed Administrative Claim: (i) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as is reasonably practicable; (ii) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Claim is due; or (iii) at such time and upon

13

such terms as set forth in an order of the Bankruptcy Court. All Administrative Claims for which no application is timely filed shall be forever barred. Notwithstanding the foregoing, all United States Trustee Fees will be satisfied on or before the Effective Date without need for the filing of an application, and all Professional Claims will be paid in accordance with Section 3.2 of the Plan.

The Holder of an Administrative Claim, other than: (i) a Professional Claim; (ii) a liability incurred but not yet due and payable in the ordinary course of business by the Debtor until after the thirtieth (30th) day after the Effective Date; (iii) an Administrative Claim that has been Allowed on or before the Effective Date; (iv) an expense or liability incurred in the ordinary course of business by the Reorganized Company on or after the Effective Date; or (v) United States Trustee Fees, must file with the Bankruptcy Court and serve on the Reorganized Company and the Office of the United States Trustee, a request for payment of such Administrative Claim, together with supporting documentation, so as to be received on or before the date that is the first Business Day that is twenty-one (21) days after the Effective Date. Failure to file and serve such request for payment timely and properly shall result in the Administrative Claim being forever barred and discharged.

The Debtor has been paying ordinary course expenses post-petition on a regular basis, and no Administrative Claims have been filed against the Debtor. The Debtor does not anticipate making a distribution on the Effective Date on account of Administrative Claims, except with respect to the Initial Professional Payment and any United States Trustee Fees due and owing, discussed in more detail below.

### b.     Professional Claims

Upon agreement of each Professional and the Debtor, each Professional will receive, on account of its Allowed Professional Claims, its pro rata shares of the Initial Professional Payment on the Effective Date. The remainder of the amounts owed to the Professionals on account of their Allowed Professional Claims shall be paid by the Disbursing Entities on the schedule set forth in the Professional Payment Schedule until the Allowed Professional Claims are paid in full. The Professional Payment is secured by the Professional Security Package.

All final requests by Professionals for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Disbursing Entities shall pay Professional Claims in Cash in the amount Allowed by the Court as set forth in Section 3.2 of the Plan. From and after the Effective Date, any requirement that Professionals comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Company may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

Professionals are owed approximately $760,000 in the aggregate through June 2017: (i) Province, Inc. = $156,000; (ii) Harter Secrest & Emery LLP = $47,000; (iii) Pachulski Stang

Ziehl & Jones LLP = $444,000; and (iv) Huron Consulting Services LLC = $113,000.  This does not take into consideration professional fees and expenses not yet invoiced.  Additional professional expenses are expected to accrue through the Effective Date.  On the Effective Date, the Initial Professional Payment (in the amount of $500,000) will be paid to the Holders of Allowed Professional Claims on a pro rata basis.  The remainder of the Allowed Professional Claims will be paid over one (1) year in quarterly installments commencing December 1, 2017 pursuant to the Professional Payment Schedule.

### c.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive on account of such Claim, payment in Cash from the Disbursing Entities in an amount equal to the amount of such Allowed Priority Tax Claim as soon as reasonably practicable following the later of:  (i) the Effective Date; or (ii) the date upon which the Priority Tax Claim becomes Allowed.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

Any Claims asserted by any governmental unit on account of any fees, penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims.  On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

The New York State Department of Labor and the New York State Department of Taxation and Finance have asserted priority tax claims in the aggregate amount of $274.89.  This represents the total amount of Priority Tax Claims asserted against the Debtor.

### d.      United States Trustee Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code and any applicable interest thereon that are due and payable as of the Effective Date shall be paid by the Disbursing Entities or the Debtor in full in Cash on the Effective Date or as soon thereafter as is reasonably practicable.  All such fees and any applicable interest thereon that becomes due and payable after the Effective Date shall be paid by the Disbursing Entities or Reorganized Company when such fees become due and payable.  All such fees and any applicable interest thereon shall continue to become due and payable until the entry of a final decree closing the Chapter 11 Case or conversion or dismissal of the Chapter 11 Case, whichever is earlier.

### 2.      Treatment of Classified Claims under the Plan

### a.      Other Priority Claims (Class 1)

The Debtor is not currently aware of any outstanding Other Priority Claims. Except to the extent that a Holder of an Allowed Other Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Priority Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Other Priority Claim that has not been paid in full prior to the Effective Date shall be paid in full in Cash within thirty (30) days after the following: (i) the Effective Date; or (ii) the date such claim is deemed an Allowed Claim, whichever is later.

Class 1 is Unimpaired and is deemed to accept the Plan.

### b.    Unsecured Global Claim (Class 2)

The Global Claim is an unsecured claim held by Global resulting from a judgment granted by the United States District Court for the Central District of Florida, on or about April 24, 2014, in favor of Global and against the Debtor for $10,059,558.19, which was affirmed by the United States Court of Appeals for the Ninth Circuit. The Global Claim is deemed Allowed. Global shall receive the Initial Global Payment on the Effective Date. In addition, Global shall receive the Residual Settlement Payment in installment payments as set forth in the Global Payment Schedule; provided, however, that the Global settlement amount shall be reduced as provided in the Global Settlement Amount Reduction Schedule, as appropriate. Interest on the Residual Settlement Payment shall accrue at 6% per annum from the Effective Date until the Holder's Claim is satisfied. The Global Payment is secured by the Global Security Package.

Class 2 is Impaired and is entitled to vote to accept or reject the Plan.

### c.    Other Unsecured Claims (Class 3)

The Other Unsecured Claims consist of all unsecured nonpriority claims against the Debtor other than the Global Claim and Intercompany Claims. The approximate aggregate value of the Other Unsecured Claims as asserted or scheduled is $2.4 million. Except to the extent that a Holder of an Allowed Other Unsecured Claim has agreed to a less favorable treatment of such Claim, each Holder of an Allowed Other Unsecured Claim shall receive Cash equal to the Maximum Claim Allowance (*i.e.* 94% of the full amount of such Allowed Claim) in installment payments as set forth in the GUC Payment Schedule. Specifically, each Holder of an Allowed Other Unsecured Claim shall receive: (i) an allocable pro rata share of the Initial GUC Payment on the Effective Date; and (ii) its allocable pro rata share of the Aggregate MCA on the schedule set forth in the GUC Payment Schedule up to the Maximum Claim Allowance. Interest on the MCA Payment shall accrue at 6% per annum from the Effective Date until the Holder's Claim is satisfied. The GUC Payment is secured by the GUC Security Package.

In the alternative, each Holder: (i) of an Allowed Other Unsecured Claim that is less than or equal to $30,000 in value; or (ii) of an Allowed Other Unsecured Claim that is greater than $30,000 in value but who voluntarily elects to reduce such Claim to $30,000, may elect, in its sole discretion, to receive sixty percent (60%) of its Allowed Claim in Cash on the Effective Date in full satisfaction of such Claim.

Class 3 is Impaired and entitled to vote to accept or reject the Plan.

16

### d. Intercompany Claims (Class 4)

Intercompany Claims consist of any Claim held by a Non-Debtor Affiliate against the Debtor. Holders of Intercompany Claims shall not receive any specific distribution under the Plan on account of such Claims. Intercompany Claims will, however, remain in place and will not be discharged in the Chapter 11 Case pursuant to the Plan, Confirmation Order, Bankruptcy Code or otherwise. The Non-Debtor Affiliates and the Debtor shall be free to continue intercompany relationships and Intercompany Transactions; provided, however, that no Intercompany Transaction shall impair the Disbursing Entities' ability to make any payments contemplated under the Plan.

Class 4 is Unimpaired and is deemed to accept the Plan.

### e. Shareholder Interest (Class 5)

National Holdings shall retain its shares in the Debtor pursuant to the substantial contributions made by it and the Disbursing Entities to fund distributions under the Plan (*i.e.* the New Value Contribution), subject to the releases set forth in Section 12.10.2 of the Plan.

Class 5 is Unimpaired and is deemed to accept the Plan.

## D. *Voting Procedures and Requirements*

### 1. Eligibility to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims against the Debtor that are "Impaired" under the Plan are entitled to vote on whether to accept or reject the Plan. Generally, a class is "impaired," unless the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security. Holders of Claims or Interests in Impaired Classes are entitled to vote only if receiving or retaining property on account of such Claims or Interests under the Plan. Impaired Classes that will neither receive nor retain property under the Plan on account of their Claims or Interests are conclusively deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code. Therefore, there is no need to solicit Holders of Claims in Impaired Classes that will neither receive nor retain property under the Plan.

Holders of Claims in Unimpaired Classes are conclusively deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code. Therefore, there is no need to solicit Holders of Claims in Unimpaired Classes.

### 2. Impaired Classes

Pursuant to Section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a distribution pursuant to the Plan may vote separately to accept or

reject the Plan. Each Holder of an Allowed Claim in an Impaired Class entitled to vote to accept or reject the Plan as of the Voting Record Date shall receive a Ballot and may cast a vote to accept or reject the Plan.

### a.    Unsecured Global Claim (Class 2)

Global is entitled to vote to accept or reject the Plan.

### b.    Other Unsecured Claims (Class 3)

Holders of Claims in Class 3 are entitled to vote if:  (i) the Debtor has listed such Claim on its Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated; (ii) no objection has been filed as to such Holder's Claim, either before or after the Voting Record Date; or (iii) the Holder of such Claim has filed a Proof of Claim on or before the applicable Claims Bar Date, except where the Debtor has specifically agreed to a late-filed Proof of Claim.

Any Claim in Class 3 to which an objection is filed and not withdrawn or dismissed is not entitled to vote, regardless of whether a Ballot was transmitted to the Holder of such Claim, unless the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a), and upon application of the Holder whose Claim was objected to, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper solely for the purpose of voting on the Plan.

### 3.    Acceptance by a Class

A Class of Claims entitled to vote to accept or reject the Plan shall be deemed to accept the Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept the Plan.  Classes 1, 4 and 5 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### 4.    Claims and Interests Not Entitled to Vote

Holders of Claims are not entitled to vote if, as of the Voting Record Date, the Claim:  (i) has been disallowed; (ii) is the subject of a pending objection; or (iii)(a) was not listed on the Debtor's Schedules or was listed on the Debtor's Schedules as unliquidated, contingent or disputed, and (b) a Proof of Claim was not filed or was filed for an unliquidated, contingent or disputed Claim, unless on or before the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise.  However, if a Claim is disallowed in part, the Holder shall be entitled to vote the Allowed portion of the Claim.  Insiders are entitled to vote on the Plan subject to and in accordance with the Bankruptcy Code.

The Plan Proponents may disregard a vote if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith, or in accordance with the provisions of the Bankruptcy Code.

### 5. Factors to Consider Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may affect recoveries under the Plan and include:

> (i) Unless otherwise specifically indicated, any financial information contained in the Disclosure Statement is unaudited and based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement;
>
> (ii) Although the Plan Proponents believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Plan Proponents can assure neither such compliance nor that the Bankruptcy Court will confirm the Plan; and
>
> (iii) The Plan Proponents are requesting Confirmation without the acceptance of all Impaired Classes in accordance with Section 1129(b) of the Bankruptcy Code.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan ("Voting Classes") or necessarily require a re-solicitation of the votes of holders of Claims and Interests in such Voting Classes.

### 6. Solicitation Procedures

#### a. Claim Holder Solicitation Package

The following materials will constitute the solicitation package ("Solicitation Package") distributed to holders of Claims and Interests entitled to vote to accept or reject the Plan: (i) appropriate Ballot(s) and applicable voting instructions; (ii) the Disclosure Statement, including the Plan with all exhibits; (iii) the Tew Declaration, (iv) the notice of the Confirmation Hearing; (v) the order approving this Disclosure Statement; (vi) a pre-addressed postage paid return envelope; and (vii) such other materials as the Court may direct.

#### b. Distribution of Solicitation Package

The Plan Proponents will distribute Solicitation Packages to holders of Claims in Class 2 and Class 3, as well as to Contract Counterparties (as defined herein), after Bankruptcy Court approval of the Disclosure Statement, and at least thirty (30) days before the Confirmation Hearing. If you hold a Claim in any of the Classes entitled to vote, or if you are a Contract Counterparty, but you do not receive the Solicitation Package, or if the materials are damaged or lost, you should contact:

LIPPES MATHIAS WEXLER FRIEDMAN, LLP
Attn: Ian Klak
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100
iklak@lippes.com

One may also obtain copies of any pleadings filed with the Bankruptcy Court free via PACER at http://www.nywb.uscourts.gov.

###### c. **Voting Procedures**

The Voting Record Date will be the date for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. The Holders of Claims in the Voting Classes must properly complete, execute and deliver their Ballots, so that they are *actually received on or before the Voting Deadline*, to the following address:

LIPPES MATHIAS WEXLER FRIEDMAN, LLP
Attn: Ian Klak
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202

If you hold Claims in more than one Class (as classified in the Plan), you must submit a separate Ballot for each such Claim. You may file Ballots accepting or rejecting the Plan with the Bankruptcy Court at any time before the Voting Deadline.

In addition to casting their votes to accept or reject the Plan, the Plan Proponents also propose that Holders of Class 3 Claims that: (i) have Allowed Claim(s) in an amount less than or equal to $30,000 and elect to receive Convenience Class Treatment for such Claim(s); or (ii) who have Allowed Claims(s) greater than $30,000, but voluntarily elect to reduce those Claim(s) to $30,000 and receive Convenience Class Treatment for such Claim(s), make that election when completing and returning their Ballot(s) as set forth in Section 8.2 of the Plan. **Specifically, the Plan Proponents propose that: (i) Holders of Class 3 Claims with Claims that are less than or equal to $30,000 that elect to receive Convenience Class Treatment for such Claim(s); and (ii) Holders of a Class 3 Claims with Claims that are greater than $30,000, but whom voluntarily elect to reduce such Claims to $30,000 and to receive Convenience Class Treatment for such Claim(s), check the appropriate box on their Ballots to elect Convenience Claim Treatment under the Plan.**

**The default treatment for Allowed Other Unsecured Claims is Cash equal to the Maximum Claim Allowance (*i.e.* 94% of the full amount of such Allowed Claim) in installment payments as set forth in the GUC Payment Schedule, as more particularly described in Section 5.1.3 of the Plan (the "<u>Default Treatment</u>"). For a Holder of an Allowed Other Unsecured Claim to have its Claim treated as a Convenience Claim, it must**

**affirmatively elect that treatment by checking the appropriate box on the Ballot. Holders of Other Unsecured Claims that: (i) fail to return a Ballot by the Voting Deadline; or (ii) return a Ballot by the Voting Deadline, but do not opt-in to Convenience Class Treatment will be deemed to have elected the Default Treatment.**

IF THE BANKRUPTCY COURT RECEIVES A BALLOT AFTER THE VOTING DEADLINE, IT WILL NOT COUNT UNLESS THE DEBTOR DETERMINES OTHERWISE IN ITS SOLE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT: (I) DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN; OR (II) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE PLAN PROPONENTS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON OR ACCOMPANYING SUCH HOLDER'S BALLOT.

7.  **Cramdown**

The Plan Proponents request Confirmation under Section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code. The Plan Proponents reserve the right to modify the Plan to the extent that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

E.  *Means for Implementation*

1.  **Funding Overview**

Holders of Administrative Claims, Priority Tax Claims and the United States Trustee Fees will be paid by the Disbursing Entities as set forth in Section 3 above. Upon agreement of the Professionals and the Debtor, the Professionals will receive, on account of their Allowed Professional Claims, their pro rata shares of the Initial Administrative Payment on the Effective Date. The remainder of the amounts owed to the Professionals shall be paid by the Disbursing Entities on the schedule set forth in the Professional Payment Schedule until the Allowed

Professional Claims are paid in full. Each Holder of an Allowed Other Priority Claim that has not been paid in full prior to the Effective Date shall be paid in full by the Disbursing Entities in Cash within thirty (30) days of the following: (i) the Effective Date; or (ii) the date such claim is deemed an Allowed Claim, whichever is later. In addition, the Disbursing Entities have agreed to contribute the sum of $9.5 million (subject to adjustment as provided herein), plus a sum equal to the Aggregate MCA and the Convenience Class Payment, respectively, to fund Plan distributions to Classes 2 and 3, as set forth in more detail in Section 7.1.2 of the Plan and Article V(E)(2) of this Disclosure Statement. Incorporated herein by reference is the *Declaration of Michael Tew Regarding Disclosure Statement and Plan* [Docket No. 823] (the "Tew Declaration"), which provides additional detail regarding the source of plan funding. The Tew Declaration is included in the Solicitation Package (as defined herein).

### 2. Contributions from the Non-Debtor Affiliates and Alfs

In exchange for the releases set forth in Section 12.10.2 of the Plan and Article V(N)(10) of this Disclosure Statement, and subject to the retention of equity by National Holdings, the Alfs and the Non-Debtor Affiliates will contribute the New Value Contribution to fund distributions contemplated under the Plan.[10] Specifically with respect to funding distributions to Holders of Allowed Claims in Classes 2 and 3, the Alfs and Non-Debtor Affiliates have agreed to contribute the sum of $9.5 million (subject to adjustment as provided herein), a sum equal to the Aggregate MCA and the Convenience Class Payment, respectively, as set forth in Sections 5.1.2 and 5.1.3 of the Plan and Article VI(G) of this Disclosure Statement. Further, the Alfs and Non-Debtor Affiliates have agreed to fund distributions to Professionals on account of their Allowed Professional Claims on the schedule set forth in the Professional Payment Schedule and discussed in more detail in Section 3.2 of the Plan and Article V(C)(1) of this Disclosure Statement.

Subject to the preceding paragraph, the New Value Contribution shall be funded by the Disbursing Entities on behalf of themselves and the Debtor as follows: (i) the Initial Global Payment shall be made to Global on or prior to the Effective Date; (ii) the Initial GUC Payment shall be made to the Holders of Allowed Other Unsecured Claims on or prior to the Effective Date on a pro rata basis; (iii) the Convenience Class Payment shall be made to the Holders of Convenience Claims on the Effective Date; (iv) the Initial Professional Payment shall be made on a pro rata basis to each Professional on the Effective Date; (v) the Residual Settlement Payment shall be paid to Global on the schedule set forth in the Global Payment Schedule; provided, however, that the Global settlement amount shall be reduced as provided in the Global Settlement Amount Reduction Schedule, as appropriate; (vi) the MCA Payment shall be paid to Holders of Allowed Other Unsecured Claims on the schedule set forth in the GUC Payment Schedule; and (vii) the Residual Professional Payment shall be paid to the Professionals on the schedule set forth in the Professional Payment Schedule. Interest on the Residual Settlement Payment and the MCA Payment shall accrue at 6% per annum. The Residual Settlement Payment is secured by the Global Security Package; the MCA Payment is secured by the GUC

---

[10] As set forth in the Tew Declaration, the Initial Global Payment will be funded, in part, through $4 million in insurance proceeds from the Insurers (as defined in the Tew Declaration), on behalf of the Alfs and Individual Defendants, in connection with the settlement of the Committee Litigation and Global Litigation/Global Claim, subject to the receipt of appropriate releases.

22

Security Package; and the Residual Professional Payment is secured by the Professional Security Package.

The exact amount provided by any of the Disbursing Entities to the New Value Contribution is not predetermined. Rather, those amounts will be based on available liquidity from operations at the time each payment under the Plan becomes due. In that regard, each payment under the New Value Contribution may come from one or more of the Disbursing Entities, as well as the Debtor.

For the avoidance of doubt, nothing in Section 7.1.2 of the Plan, nor in any other provision of the Plan, shall be construed or deemed to be an acceptance or agreement by any of the Non-Debtor Affiliates or the Alfs to be directly or indirectly responsible for payment of or to be directly or indirectly obligated to pay any Claim against the Debtor; and the sole obligation of the Non-Debtor Affiliates and the Alfs is to perform their specific obligations under the terms and conditions of the Plan.

### 3.      New Value Corollary

As set forth in more detail in Section 7.1.2 of the Plan and Article V(E)(2) of this Disclosure Statement, the Alfs and Non-Debtor Affiliates will collectively contribute more than $12,000,000 in New Value Contributions to fund distributions under the Plan, which pays creditors in full or almost in full.  This substantial contribution justifies National Holdings' retention of its Shareholder Interest, as evidenced by the support for the Plan by the Committee and Global and the lack of any competing plan despite the fact that the Debtor's exclusive period to file a plan has long since lapsed.

### 4.      The Security Packages

#### a.      The GUC Security Package

The MCA Payment will be secured by the GUC Guaranty Agreement.  The Securing Parties shall cause any new U.S.-based or domiciled affiliate of any of the Securing Parties to sign a joinder to the GUC Guaranty Agreement.  In addition, the Securing Parties shall execute the GUC Stipulated Judgment, admitting to liability with respect to the MCA Payment, which shall be held in escrow by the GUC Administrator until the earlier of:  (i) the 31st day a default remains uncured; or (ii) the payment in full of the MCA Payment, in which case within three (3) business days the GUC Stipulated Judgment shall be returned to counsel for the Debtor.  For avoidance of doubt, the Securing Parties' guarantee of the MCA Payment will not limit in any way the Securing Parties' ability to finance their operations.

#### b.      The Global Security Package

The Residual Settlement Payment will be secured by the Global Guaranty Agreement.  The Securing Parties shall cause any new U.S.-based or domiciled affiliate of any of the Securing Parties to sign a joinder to the Global Guaranty Agreement.  In addition, the Securing Parties shall execute the Global Stipulated Judgment, admitting to liability with respect to the Residual Settlement Payment, which shall be held in escrow by Global until the earlier of:  (i) the 31st day a default remains uncured; or (ii) the payment in full of the Residual Settlement

Payment, in which case within three (3) business days the Global Stipulated Judgment shall be returned to counsel for the Debtor. For avoidance of doubt, the Securing Parties' guarantee of the Residual Settlement Payment will not limit in any way the Securing Parties' ability to finance their operations.

### c.     The Professional Security Package

The Residual Professional Payment for each Professional will be secured by a Professional Guaranty Agreement for the benefit of each Professional. The Securing Parties shall cause any new U.S.-based or domiciled affiliate of any of the Securing Parties to sign a joinder to the each Professional Guaranty Agreement. In addition, the Securing Parties shall execute a Professional Stipulated Judgment for the benefit of each Professional, admitting to liability with respect to the Residual Professional Payment, which shall be held in escrow by each Professional until the earlier of: (i) the 31st day a default remains uncured; or (ii) the payment in full of the Residual Professional Payment, in which case within three (3) business days the applicable Professional Stipulated Judgment shall be returned to counsel for the Debtor. For avoidance of doubt, the Securing Parties' guarantee of the Residual Professional Payment will not limit in any way the Securing Parties' ability to finance their operations.

### 5.     The GUC Administrator

The GUC Administrator shall be a Person selected by the Committee no later than ten (10) days prior to the Confirmation Hearing. In the event that the GUC Administrator resigns, is terminated or is otherwise unable to serve as the GUC Administrator, then the Chairperson of the Committee or the Bankruptcy Court may designate a Person to serve as the successor GUC Administrator. Notice of the appointment of a successor GUC Administrator shall be filed by the successor GUC Administrator with the Bankruptcy Court.

The GUC Administrator may resign by giving prior written notice to the Bankruptcy Court, the Debtor and each Holder of a Class 3 Other Unsecured Claim that did not elect to receive Convenience Class Treatment (the "Notice"); provided, however, that such resignation shall not be effective until the earlier of: (i) thirty (30) days after the date of the filing of such Notice; or (ii) the appointment of a successor GUC Administrator pursuant to this Section 7.2. The GUC Administrator may be removed for "cause" upon order of the Bankruptcy Court after notice and opportunity for a hearing by a party in interest.

The GUC Administrator shall: (i) hold in escrow the GUC Stipulated Judgment as set forth in Section 7.1.4.1 of the Plan; and (ii) have standing and be empowered and authorized to enforce the terms of the GUC Security Package. To the extent the GUC Administrator is required to take any enforcement action due to an Event of Default under Section 7.6 of the Plan, it shall be entitled to reimbursement of its legal fees and expenses by the Securing Parties.

### F.     *Actions Necessary and Appropriate*

On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Company may operate its business and use, acquire, or dispose of property free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Company and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### G.    *Incentive Plans & Employee/Retiree Benefits*

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order, the Reorganized Company shall:  (i) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtor who served in such capacity from and after the Petition Date; and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to Section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in Section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable non-bankruptcy law.

### H.    *Event of Default*

Upon the occurrence of an Event of Default, the unpaid portion of the New Value Contribution (the "Remaining Debt") shall immediately become due in full and shall accrue interest at a rate of twelve percent (12%) annum (the "Default Rate"); provided, however, that if the Event of Default is Cured within thirty (30) days, the Remaining Debt shall be reinstated at the non-Default Rate of six percent (6%) annum (the "Interest Rate").  Further, if the Event of Default is not cured within thirty (30) days:  (i) the GUC Administrator, Global and the Professionals (the "Plan Secured Parties") shall be allowed to execute on their respective security documents; and (ii) the Plan Secured Parties shall be entitled to the entry of a worldwide freezing order that restrains the Debtor and Non-Debtor Affiliates from disposing of their assets in all jurisdictions around the world.  The Debtor, the Alfs and the Non-Debtor Affiliates shall be barred from and waive any right to contest entry of such worldwide freezing order.  Prior to any Plan Secured Party executing on its respective security documents in accordance with Section 7.6 of the Plan, it must provide notice to the other Plan Secured Parties in accordance with Section 15.15 of the Plan.  To the extent the Plan Secured Parties are required to take any enforcement action due to an Event of Default, they each shall be entitled to reimbursement of their legal fees and expenses by the Securing Parties.  Nothing herein shall be construed to limit the rights and remedies of any Plan Secured Party, including without limitation seeking entry of the GUC Stipulated Judgment, the Global Stipulated Judgment or any Professional Stipulated Judgment.

Case 1-14-12414-MJK    Doc 833,    Filed 09/21/17    Entered 09/21/17 11:49:35,
Description: Main Document  , Page 30 of 66

For the avoidance of doubt, the interest due and owing on any payment required to Cure a monetary Event of Default shall be calculated at the Interest Rate and not the Default Rate.

**I.      *Intercompany Claims***

Holders of Intercompany Claims shall not receive any specific distribution under the Plan on account of such Claims.  Intercompany Claims will, however, remain in place and will not be discharged in the Chapter 11 Case pursuant to the Plan, Confirmation Order, Bankruptcy Code or otherwise.  The Non-Debtor Affiliates and the Debtor shall be free to continue intercompany relationships and Intercompany Transactions; <u>provided</u>, <u>however</u>, that no Intercompany Transaction shall impair the Disbursing Entities' ability to make any payments contemplated under the Plan.

**J.      *Distributions***

**1.      Transfer of Claims**

The various transfer registers for each of the Classes of Claims as maintained by the Debtor, or its respective agents, shall be deemed closed as of the close of business on the Confirmation Date.  Thereafter, any change of the Holder of a Claim shall be effective on a date selected by the Debtor or the Reorganized Company that is no later than thirty (30) days after the transferee is substituted for the transferor of such Claim pursuant to Bankruptcy Rule 3001.

**2.      Convenience Claims**

Each Holder of an Allowed Other Unsecured Claim that is less than or equal to $30,000 in value may elect, in its sole discretion, to receive sixty percent (60%) of its Allowed Claim in Cash on the Effective Date in full satisfaction of such Claim.  The Holder must make its payment election when voting on the Plan by checking the appropriate box on its Ballot.

Each Holder of an Allowed Other Unsecured Claim that is greater than $30,000 in value may elect, in its sole discretion, to voluntarily reduce such Claim to $30,000 and receive sixty (60%) of that amount in Cash on the Effective Date in full satisfaction of such Claim.  The Holder must make its reduction and payment election when voting on the Plan by checking the appropriate box on its Ballot.

The default treatment for Allowed Other Unsecured Claims is Cash equal to the Maximum Claim Allowance (i.e. 94% of the full amount of such Allowed Claim) in installment payments as set forth in the GUC Payment Schedule, as more particularly described in Section 5.1.3 of the Plan (the "<u>Default Treatment</u>").  For a Holder of an Allowed Other Unsecured Claim to receive Convenience Class Treatment for its Claim, it must affirmatively elect that treatment by checking the appropriate box on its Ballot.  Holders of Other Unsecured Claims that:  (i) fail to return a Ballot by the Voting Deadline; or (ii) return a Ballot by the Voting Deadline but does not opt-in to Convenience Class Treatment will be deemed to have elected the Default Treatment.

Holders of Other Unsecured Claims that elect to receive Convenience Class Treatment for their Allowed Claims will receive a Cash distribution in an amount equal to sixty percent

(60%) of such Claims (initially reduced to $30,000 as necessary) on the Effective Date from the Disbursing Entities, in full satisfaction of such Claims.

### 3. Distributions

All distributions under the Plan shall be made by the Disbursing Entities on or after the Effective Date, or as otherwise provided herein. No bond or surety for the performance of the duties of the Disbursing Entities under the Plan shall be required unless ordered by the Bankruptcy Court. In the event that the Disbursing Entities are so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Entities.

### 4. Timing

Distributions to be made on account of Claims that are Allowed Claims shall be made by the Disbursing Entities as provided in the Plan, or as ordered by the Bankruptcy Court. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date, if such distribution is made on the Effective Date or as soon thereafter, as is practicable. Any payment or distribution required under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

### 5. Interest on Claims

Unless otherwise expressly provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims, and no Claim Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Notwithstanding the preceding sentence, post-petition interest shall accrue on the Residual Settlement Payment and the MCA Payment at the Interest Rate. To the extent required by applicable bankruptcy law, and not otherwise provided for in the Plan or the Confirmation Order, post-petition interest shall accrue on Claims at the applicable non-default rate.

### 6. Consent to Different Treatment

To the extent the Holder of any Claim or any party to an Executory Contract agrees in writing to a treatment less favorable than that otherwise provided under the Plan, those agreed-upon provisions, rather than the Plan, shall specify the treatment of such Claim or Executory Contract.

### 7. Setoffs

Disbursing Entities may, but shall not be required to, setoff against any claims of any nature whatsoever that the Debtor may have against the Holder of such Claim for purposes of determining the Allowed amount of such Claim on which a distribution shall be made. Neither the failure to perform such setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim that the Debtor may have against the Holder of such Claim.

### 8. Manner of Payment

At the option of the Disbursing Entities, any Cash payment to be made under the Plan may be made by a check, wire transfer, or as otherwise required or provided in any applicable agreement between the Disbursing Entity and the Holder of an Allowed Claim receiving the disbursement.

### 9. Delivery

All distributions to any Holder of an Allowed Claim not made by wire transfer shall be made by regular mail, postage prepaid, to the address of such Holder as set forth on the Schedules or on the Debtor's books and records, unless: (i) the Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder; or (ii) the Plan or any agreement executed in connection with the Plan provides otherwise. In all cases of delivery by mail, the date of delivery or distribution shall be the date of mailing.

### 10. Minimum Distributions

No payment of Cash in an amount of less than $150.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be used in accordance with the Plan.

### 11. Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan includes both principal and accrued but unpaid interest, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 12. Distributions Free and Clear

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including, without limitation, distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges and other interests, and no other entity shall have any interest, whether legal, beneficial or otherwise, in property distributed or transferred pursuant to the Plan.

### 13. Unclaimed Distributions

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Entity will use reasonable efforts to determine the current address of such Holder. However, the Disbursing Entity will not make a distribution to such Holder unless or until it determines the then current address of such Holder. Any distributions not claimed after six (6) months will revert to the Disbursing Entity to be paid to other members of the same Class as the Holder whose distribution is unclaimed in accordance with the provisions of the Plan, subject to the Maximum Claim Allowance, as applicable. Any Claim of any other Holder to property deemed unclaimed shall be discharged and forever barred.

Any check not presented for payment within ninety (90) days after its issuance shall be void. The payee of such check shall have the sole responsibility to request a replacement check

from the Disbursing Entity, but in no event may the payee make such a request more than six (6) months after the original distribution date of such Claim.

## K.    *Procedures for Disputed Claims*

### 1.    Allowance of Claims and Interests

Except as expressly provided herein, or in any order entered in the Chapter 11 Case prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order.

### 2.    Objection Deadline and Prosecution

The Debtor shall be responsible for administering, disputing, objecting to, compromising, or otherwise resolving the Claims.  Any objections to the Claims shall be filed by the Debtor no later than the Claims Objection Deadline and served upon the Holders of each of the Claims to which it has made objections.  Nothing contained in the Plan, however, shall limit the Debtor's right to object to Claims, if any, filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of the Claims Objection Deadline, and unless subsequently ordered for good cause shown to shorten time, the Debtor shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to Disputed Claims until such Disputed Claims are Allowed or not.  Subject to the limitations set forth in the Plan, the Debtor shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction on the validity, nature, and/or amount thereof.

29

### 3. Estimation of Claims

Before the Effective Date, the Debtor, and on or after the Effective Date, the Reorganized Company, may (but are not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Company may pursue supplementary proceedings to object to the allowance of such Claim. Before the Effective Date, the Debtor, and on or after the Effective Date, the Reorganized Company, are further authorized to file a Proof of Claim or Interest as provided under Section 501(c) of the Bankruptcy Code.

### 4. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim and the remainder has been disallowed.

### 5. Distributions After Allowance

Payments and distributions shall be made as appropriate to the Holder of any Disputed Claim that has become an Allowed Claim by the Disbursing Entities as set forth in the Plan. Such distributions shall be based upon the cumulative distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been Allowed on the Effective Date (excluding any present value calculations) and shall not be limited by the Disputed Claim amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to Holders of Allowed Claims.

## L. *Executory Contracts and Unexpired Leases*

### 1. Assumption of Executory Contracts

Except as otherwise provided herein, each Executory Contract shall be deemed assumed, without the need for any further notice to, or action, order, or approval of, the Bankruptcy Court, as of the Effective Date under Section 365 of the Bankruptcy Code, unless any such Executory Contract: (i) was already assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (ii) specifically designated or generally described on any document exhibit to the Plan as a contract or lease subject to rejection; or (iii) subject of a separate motion filed under Section 365 of the Bankruptcy Code to assume or reject such contract by the Debtor prior to the Effective

Date.  The assumption of Executory Contracts hereunder may include the assignment of certain of such contracts to affiliates upon thirty (30) days' notice and an opportunity to object to the contract counterparty.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions.

Except as otherwise provided herein or agreed to by the Debtor with the applicable counterparty, each assumed Executory Contract shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder.  Modifications, amendments, supplements and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the pre-petition nature of the Executory Contract or the validity, priority or amount of any Claims that may arise in connection therewith.

**2.      Cure of Defaults & Objections to Assumption**

The proposed cure amount for each Executory Contract shall be the higher of the amount set forth in:  (i) the Schedules; (ii) a Proof of Claim filed by such counterparty; or (iii) Schedule 1 annexed to the Plan.  Cure obligations, if any, shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, by the Debtor or Reorganized Company or on such other terms as the parties to such Executory Contract may otherwise agree.  Any objection to the assumption of an Executory Contract pursuant to the Plan, including with respect to the proposed Cure, must be filed with the Bankruptcy Court by the deadline established for filing objections to the Plan.  The hearing on any such objection may be held at the Confirmation Hearing or as otherwise scheduled by the Bankruptcy Court.  Any counterparty to an Executory Contract that receives notice and fails to timely object to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption.

If there is a dispute regarding the ability of the Reorganized Company or any assignee to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, including a Cure dispute, then payment of the Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtor or Reorganized Company, as applicable, and the counterparty to the Executory Contract.  The Debtor or Reorganized Company, as applicable, reserve the right to either reject or nullify the assumption of any Executory Contract within forty-five (45) days after entry of a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption.  All Proofs of Claim based upon

31

Executory Contracts that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to, or action, order or approval of, the Bankruptcy Court.

### 3. Insurance Policies

For the avoidance of any doubt, all rights of the Debtor under any Insurance Policies shall be preserved and shall vest with the Reorganized Company and shall remain in full force and effect after the Effective Date for the respective terms of such Insurance Policies; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such Insurance Policies.

### 4. Survival of Indemnification Obligations

Any obligations of the Debtor pursuant to its corporate charters and by-laws or agreements entered into any time prior to the Effective Date to indemnify: (i) current directors, officers, agents, and/or employees; and (ii) certain current and former employees, with respect to all present and future actions, suits, and proceedings against the Debtor or such indemnified parties, based upon any act or omission for or on behalf of the Debtor, shall not be discharged or impaired by confirmation of the Plan.

## M. *Conditions Precedent to Effective Date*

### 1. Conditions Precedent

The Effective Date is the first Business Day on which all of the following conditions have been satisfied or waived in the discretion of the Debtor, the Committee and Global:

(i) the Confirmation Order shall have become a Final Order in form and substance reasonably satisfactory to the Debtor, Global and the Committee;

(ii) all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the Security Packages, shall have been effected or executed; and

(iii) after (i) and (ii), the Initial Payments shall have been funded and paid pursuant to the terms of the Plan.

### 2. Notice

Upon satisfaction of all of the following conditions, the Debtor shall send notice of the Effective Date to all known creditors and parties in interest.

### 3. Effect of Failure of Conditions

If the conditions precedent specified in Section 11.1 of the Plan have not been satisfied or

waived within thirty (30) days after the Confirmation Order becomes a Final Order, which period may be extended by Order of the Court, then: (i) the Confirmation Order shall be vacated; (ii) no distributions under the Plan shall be made; (iii) the Debtor and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (iv) all of the Debtor's obligations with respect to Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims or interests by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor or otherwise.

**N.**   *Effect of Confirmation*

**1.**   **Effective Date**

On the Effective Date or thereafter as specified herein, among other things, the Holders of Claims that are Allowed Claims as of such Effective Date shall receive the treatment specified in the Plan.

**2.**   **Vesting of Assets**

Except as otherwise set forth in the Plan, upon the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's Estate shall vest in the Reorganized Company free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order. The Reorganized Company may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code and in all respects as if there were no pending cases under the Bankruptcy Code, except as provided in the Plan.

**3.**   **Binding Effect**

On the Effective Date, and effective as of the Effective Date, the Plan shall be binding upon the Debtor, the Committee, and all present and former Holders of Claims against and Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Interest has voted or failed to vote to accept or reject the Plan and regardless of whether any such Holder of a Claim or Interest is entitled to receive any distribution under the Plan.

**4.**   **Discharge**

To the fullest extent provided under Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, as of the Effective Date, of all Claims, Interests, and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against liabilities of, Liens on, obligations of, rights against, and Interests in, the Estate, the Debtor, or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests,

33

including demands, liabilities, and causes of action that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 5.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.

### 6.    Injunction

**Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Persons and Entities who have held, hold or may hold Claims against or Interests in the Debtor, are permanently enjoined, on and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor on account of any such Claim or Interest; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest; and (v) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are retained pursuant to the Plan, if any. Such injunction shall extend to successors of the Debtor, including, without limitation, the Reorganized Company.**

**Holders of Claims or Interests shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover any claims and/or Causes of Action released and discharged pursuant to the Plan, including those set forth in Section 12.10 of the Plan; provided, however, that the injunction provided for in this Section shall not: (i) bar actions based upon liability for acts or omissions that are the result of fraud, gross negligence, willful misconduct or willful violation of the securities laws or the Internal Revenue Code; (ii) preclude police, federal tax, or regulatory**

authorities from fulfilling their statutory duties; or (iii) bar the Claims, if any, of the United States of America.

Nothing in the Plan, including without limitation Section 12.6 of the Plan, shall be construed to limit the rights of any Plan Secured Party from enforcing any rights or remedies granted to such Plan Secured Party pursuant to the terms of the Plan.

### 7.     Terms of Injunction or Stays

Except as otherwise provided in the Plan, to the extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan: (i) all injunctions with respect to or stays against an action against property of the Debtor's Estate arising under or entered during the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, and in existence on the Confirmation Date, shall remain in full force and effect until such property is no longer property of the Debtor's Estate; and (ii) all other injunctions and stays arising under or entered during the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earlier of (a) the date that the Chapter 11 Case is closed pursuant to a Final Order of the Bankruptcy Court or (b) the date that the Chapter 11 Case is dismissed pursuant to a Final Order of the Bankruptcy Court.

### 8.     Injunction Against Interference with Plan

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan by the Debtor and its respective affiliates, employees, advisors, officers and directors, agents, and other Related Persons.

### 9.     Section 525 Injunction

Subject to the exceptions set forth in Section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend or refuse to renew any license, permit, charter, franchise or other similar grant to, or condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Company or any other Person with whom they have been associated or refuse to permit the Reorganized Company to participate in any governmental program, solely because the Reorganized Company commenced the Chapter 11 Case or was insolvent before the commencement of the Chapter 11 Case, or during the Chapter 11 Case but before the Reorganized Company is granted or denied a discharge, or has not paid a debt that is dischargeable in the Chapter 11 Case.

### 10.     Releases

In accordance with the requirements of Bankruptcy Rule 3016(c), the provisions of Section 12.10 of the Plan operate, in part, to specifically release certain individuals and entities from all claims arising out of this Chapter 11 Case and enjoin certain acts in connection with such releases. Such releases cover not only the Debtor but also certain third parties whose

interests are congruent with those of the Debtor in this Chapter 11 Case and whose contributions are so critical to the reorganization effort that without them the reorganization effort would fail. The Plan Proponents believe that without the protection of such releases the Plan would have less likelihood of success.

The releases are justified as an integral part of the Debtor's overall restructuring and liquidation efforts. Specifically, the Released Parties will all make substantial contributions to the Debtor's estate (i.e. the New Value Contribution), without which the Debtor may not have been able to propose a confirmable Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases and constitute its finding that the releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the releases; (ii) in the best interests of the Debtor and all Holders of Claims; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Holders of Claims and Interests asserting any claim released by the releases against any of the Released Parties.

### a. Releases of the Plan Proponents and Professionals

**EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTOR (WHETHER OR NOT ALLOWED), AND EACH PERSON OR ENTITY PARTICIPATING IN EXCHANGES AND DISTRIBUTIONS UNDER OR PURSUANT TO THE PLAN, FOR ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, CURRENT AND FORMER OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES, IN EACH CASE IN THEIR CAPACITY AS SUCH, SHALL BE DEEMED TO HAVE RELEASED ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST (I) THE DEBTOR; (II) THE COMMITTEE AND MEMBERS OF THE COMMITTEE IN THEIR CAPACITY AS MEMBERS OF THE COMMITTEE; (III) GLOBAL; AND (IV) THE PROFESSIONALS AND EACH RELEASED PARTIES' RELATED PERSONS, PREDECESSORS IN INTEREST, SUCCESSORS, ASSIGNS, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS, INCLUDING THOSE ARISING PRIOR TO THE EFFECTIVE DATE FROM ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THIS CHAPTER 11 CASE AND RELATED PROCEEDINGS, INCLUDING, BUT NOT LIMITED TO, FILING OF THIS CHAPTER 11 CASE, ADMINISTRATION OF THIS CHAPTER 11 CASE, FORMULATION, NEGOTIATION, PREPARATION, DISSEMINATION, APPROVAL, EXECUTION, ADMINISTRATION, CONFIRMATION, IMPLEMENTATION, OR CONSUMMATION OF, AS WELL AS THE SOLICITATION OF VOTES FOR, THE PLAN (INCLUDING ALL DISTRIBUTIONS THEREUNDER), THE DISCLOSURE STATEMENT AND THE PLAN SUPPLEMENT; <u>PROVIDED</u>, <u>HOWEVER</u>, (1) THE RELEASE IN SECTION 12.10.1 OF THE PLAN SHALL NOT APPLY TO ANY PERSONAL, DIRECT, NON-DERIVATIVE CLAIM OR CAUSE OF ACTION HELD BY A HOLDER (INCLUDING FOR THESE PURPOSES ANY OF ITS RESPECTIVE SUCCESSORS, ASSIGNS, TRANSFEREES, CURRENT AND FORMER OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES) OF A CLAIM AGAINST OR INTEREST IN THE DEBTOR, WHETHER OR NOT SUCH CLAIM OR INTEREST IS DETERMINED TO BE AN ALLOWED**

36

**CLAIM OR ALLOWED INTEREST, AND (2) NOTHING IN SECTION 12.10.1 OF THE PLAN SHALL BE CONSTRUED TO RELEASE OR EXCULPATE ANY PERSON OR ENTITY FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR FRAUD.**

        b.      **Releases of Directors, Officers, Non-Debtor Affiliates and Additional Persons.**

**IN ADDITION, AS OF THE EFFECTIVE DATE, ALL DEFENDANTS IN THE COMMITTEE LITIGATION, INCLUDING (I) THE NON-DEBTOR AFFILIATES,[11] (II) MR. ALF AND MRS. ALF, IN THEIR CAPACITIES AS CURRENT OR FORMER OFFICERS AND DIRECTORS OF THE DEBTOR AND IN THEIR INDIVIDUAL CAPACITIES, AS APPLICABLE, AND (III) ALL INDIVIDUAL DEFENDANTS CLAIMED TO BE CURRENT OR FORMER OFFICERS OF THE DEBTOR,[12] AND THEIR RESPECTIVE PREDECESSORS IN INTEREST, SUCCESSORS, ASSIGNS, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS, SHALL BE DEEMED TO HAVE BEEN RELEASED AND DISCHARGED FROM ANY AND ALL OBLIGATIONS, LIABILITIES, CAUSES OF ACTION, DAMAGES, CLAIMS, EXTENSIONS OF JUDGEMENTS, AND DEMANDS AND MOTIONS OF ANY KIND WHATSOEVER, AT LAW OR IN EQUITY, DIRECT OR INDIRECT, KNOWN OR UNKNOWN, DISCOVERED OR UNDISCOVERED, ANY ELEMENT OF WHICH AROSE OR ACCRUED ON OR BEFORE THE EFFECTIVE DATE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN SECTION 12.10.2 OF THE PLAN SHALL BE DEEMED TO (I) RELEASE ANY SUCH PERSON FROM LIABILITY FOR ACTS OR OMISSIONS THAT ARE THE RESULT OF FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR WILLFUL VIOLATION OF THE SECURITIES LAWS OR THE INTERNAL REVENUE CODE OR THE CLAIMS, IF ANY, OF THE UNITED STATES; (II) PREVENT THE REORGANIZED COMPANY FROM OBJECTING TO THE CLAIM OF ANY SUCH PERSON; OR (III) PRECLUDE POLICE, FEDERAL TAX, OR REGULATORY AGENCIES FROM FULFILLING THEIR STATUTORY DUTIES.**

**NOTHING IN THE PLAN, INCLUDING WITHOUT LIMITATION THIS SECTION 12.10.2, SHALL BE CONSTRUED TO RELEASE ANY PARTY, INCLUDING, WITHOUT LIMITATION, THE SECURING PARTIES AND/OR THE**

---

[11] As defined in the Plan, the Non-Debtor Affiliates consists of the following: (i) Windward Drive Lot 12, LLC; (ii) National Air Cargo Holdings, Inc.; (iii) National Air Cargo GmbH; (iv) National Air Cargo S.a.r.l.; (v) NACM OHQ SDN BHD; (vi) NACM Holdings SDN BHD; (vii) National Air Cargo KK; (viii) National Air Cargo LLC; (ix) National Air Cargo Limited; (x) National Air Cargo Nederland BV; (xi) National Air Cargo Middle East FZE (DWC Branch) LLC; (xii) NAC Acquisitions, LLC; (xiii) NAC AC Ventures LLC; (xiv) NAC 300 LLC; (xv) NAC 500; (xvi) National Air Cargo Group (d/b/a National Airlines); (xvii) Braxton Acquisitions LLC; (xviii) LA 45 Equipment LLC; (xix) National Brokerage LLC; (xx) Tracking Innovations, Inc.; and (xxi) NACG Leasing, LLC.

[12] As defined in the Plan, the Individual Defendants consists of the following: (i) Glen Joerger; (ii) Jacob Matthew; (iii) Robert D. Bishop, Jr.; (iv) John Baker; (v) Brian Conaway; (vi) Shirley Kaufman; (vii) Preston Murray; and (viii) William Mortensen.

**DISBURSING ENTITES FROM ANY OBLIGATIONS UNDER THE TERMS OF THE PLAN.**

**11.  Exculpation**

**None of:  (i) the Debtor; (ii) the Committee and members of the Committee in their capacity as members of the Committee; (iii) the GUC Administrator; (iv) Global; or (v) the Professionals or any of the Released Parties' Related Persons shall have or incur any liability to any Holder of any Claim or Interest for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case and related proceedings, including, but not limited to, filing of the Chapter 11 Case, administration of the Chapter 11 Case, the formulation, negotiation, preparation, dissemination, approval, execution, administration, confirmation, implementation, or consummation of, as well as the solicitation of votes for, the Plan (including all distributions thereunder), the Disclosure Statement, or the Plan Supplement; <u>except</u> for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and as required under Rule 1.8(h)(1) of the New York State Rules of Professional Conduct, malpractice; and, in all respects, the Debtor, the Committee and its members, and each of their respective members, officers, directors, employees, advisors, professionals, attorneys, agents, and other Related Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

**12.  Release of Liens**

Except as otherwise provided herein, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged.

**13.  Dismissal of Adversary Proceedings/Waiver of Avoidance Actions**

All Adversary Proceedings brought by the Committee, including the Committee Litigation, shall be stayed until the Effective Date and then deemed dismissed with prejudice on the Effective Date without further action by the Committee or any other party.  All Avoidance Actions held by the Debtor against any third party or person arising on or prior to the Effective Date shall be waived and released as of the Effective Date.

**14.  Dissolution of Committee**

On the first (1st) Business Day following the Effective Date, and provided that the Administrator has been appointed, the Committee shall be dissolved and the Committee, its members, and professionals retained by the Committee in accordance with Section 1103 of the Bankruptcy Code will be released and discharged from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Case, <u>except</u> with respect to: (i) prosecuting applications for professionals' compensation or reimbursement of expenses incurred as a member of the Committee; (ii) asserting, disputing and participating in the resolution of Professional fee applications; and (iii) prosecuting or participating in any appeal of

38

the Confirmation Order or any request for reconsideration thereof. Upon the conclusion of (i) through (iii), the Committee shall be immediately dissolved, released, and discharged. The Professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred on behalf of the Committee after the first (1st) Business Day following the Effective Date, <u>except</u> for services rendered and expenses incurred, as approved by the Court, in connection with: (i) prosecuting applications for professionals' compensation; (ii) asserting, disputing and participating in the resolution of Professional Claims or reimbursement of expenses incurred as a member of the Committee; and (iii) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.

## O. *Modification, Revocation or Withdrawal of Plan*

### 1. Modification

Subject to the restrictions on modifications set forth in Section 1127 of the Bankruptcy Code, if applicable, the Debtor or the Reorganized Company, as applicable, reserve the right to alter, amend or modify the Plan before substantial Consummation; provided that: (i) any provision affecting the treatment of Other Unsecured Claims shall not be modified without the prior consent of the Committee; and (ii) any provision affecting the treatment of the Global Claim shall not be modified without the prior consent of Global, except with respect to (i) and (ii) as required by the Bankruptcy Court or United States Trustee.

### 2. Revocation or Withdrawal

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if confirmation as to the Debtor does not occur, then the Plan is null and void in all respects, and nothing contained in the Plan will: (i) constitute a waiver or release of any Claims by or against the Debtor; or (ii) prejudice in any manner the rights of the Debtor or any other party.

## P. *Retention of Jurisdiction*

*Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising under the Bankruptcy Code or arising in, or related to, the Chapter 11 Case, to the fullest extent permitted by law.* **Q. *Miscellaneous Provisions***

### 1. Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict-of-laws principles.

39

### 2. Additional Documents

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or Reorganized Company, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 3. Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Reorganized Company shall pay all fees payable pursuant to Section 1930 of Title 28 of the United States Code. The Disbursing Entities will keep a record of, and provide a report to, the Reorganized Company of any distributions made by it under the Plan.

### 4. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement or supplemental filings shall be deemed an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 5. No Prejudice to Insurance Recovery

Nothing contained in the Plan shall be deemed to limit or adversely affect in any way any rights that any Holder of a Claim may have to seek and obtain recovery from any insurer of the Debtor or any insurance policy covering the Debtor with respect to any portion of such Claim not paid or scheduled to be paid by the Disbursing Entities under the Plan.

### 6. Elimination of Vacant Classes

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

### 7. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 8. Substantial Consummation

As soon as practicable after the Effective Date, the Reorganized Company shall file a report of substantial consummation with the Bankruptcy Court.

### 9. No Tax Advice

The Plan will have tax consequences to the Debtor and Holders of Claims. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan and no tax opinion is given by the Disclosure Statement or Plan. No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

No representations are made regarding the particular tax consequences of the Plan to any Holder of a Claim. The tax consequences of the Plan to Holders of Claims are in many cases uncertain and may vary depending on a Holder's individual circumstances. Each Holder of a Claim is strongly urged to consult its own tax advisor regarding the federal, state, local and foreign tax consequences of the transactions described in the Plan.

### 10. Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 11. Plan Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtor's counsel at the address herein, or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nywb.uscourts.gov.

### 12. Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance acceptable to the Plan Proponents; and provided further that any such alteration or interpretation affecting the treatment of the Global Claim must be in a form and substance acceptable to Global and the Debtor. In the event of any such holding, alteration or interpretation that is acceptable to the Plan Proponents and, as applicable, Global, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been

41

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13.  Section 1125(e) Good Faith Compliance**

The Plan Proponents and each of their respective Related Persons shall be deemed to have acted in good faith under Section 1125(e) of the Bankruptcy Code.

**14.  Section 1146(a) Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

**15.  Notices**

**a.  Notices to the Debtor or Reorganized Company**

All notices, requests, and demands to or upon the Debtor or the Reorganized Company shall be in writing to be effective, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | | |
|---|---|---|
| NATIONAL AIR CARGO, INC. | | LIPPES MATHIAS WEXLER |
| Attn:  Michael Tew | | FRIEDMAN, LLP |
| 350 Windward Drive | | Attn:  Raymond L. Fink |
| Orchard Park, New York  14127 | | John A. Mueller |
| Telephone:  (716) 580-6952 | | 50 Fountain Plaza, Suite 1700 |
| mtew@ctr.nationalairlines.com | *and* | Buffalo, New York 14202 |
| | | Telephone:  (716) 853-5100 |
| | | Facsimile:  (716) 853-5199 |
| | | rfink@lippes.com |
| | | jmueller@lippes.com |

**b.  Notices to the GUC Administrator**

All notices to or upon the GUC Administrator pursuant to the Plan shall be in writing to be effective, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as set forth in the Plan Supplement.

**c.  Notices to Global**

All notices to or upon Global pursuant to the Plan shall be in writing to be effective, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

GLOBAL BTG LLC
Attn: Jacob Hodges
Manager
5406 W. 11000 N. Suite 103
Box 421
Highland, UT 84003
Jacob@globalbtg.com

PERKINS COIE LLP
Attn: Schuyler G. Carroll
        Jeffrey D. Vanacore
30 Rockefeller Center, 22nd Floor
New York, NY 10112-0085
Telephone: (212) 262-6900
Facsimile: (212) 977-1649
JVanacore@perkinscoie.com
SCarroll@perkinscoie.com

*and*

PERKINS COIE LLP
Attn: Donald J. Kula
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile (310) 788-3399
DKula@perkinscoie.com

### d.      Notices to the Professionals

All notices to or upon the Professionals pursuant the Plan shall be in writing to be effective, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered, or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as set forth in Schedule 2 to the Plan.

### e.      Standing

The GUC Administrator, Global and the Professionals shall have standing before the Bankruptcy Court to enforce the terms of the Plan, including without limitation, the GUC Security Package, the Global Security Package and the Professional Security Package, respectfully.

## VI. RISKS AND CONSIDERATIONS

### A.      *Bankruptcy Considerations*

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

Case 1-14-12414-MJK,   Doc 833,   Filed 09/21/17,   Entered 09/21/17 11:49:35,
Description: Main Document , Page 48 of 66

If the conditions precedent specified in Section 11.1 of the Plan have not been satisfied or waived by the Plan Proponents within thirty (30) days after the Confirmation Order becomes a Final Order, which period may be extended by Order of the Court, then: (i) the Confirmation Order shall be vacated; (ii) no distributions under the Plan shall be made; (iii) the Debtor and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (iv) all of the Debtor's obligations with respect to Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims or interests by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor or otherwise.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created five (5) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Pursuant to Section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that a Class votes to reject the Plan (or are deemed to reject the Plan), the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed under Section 1129(b) of the Bankruptcy Code (*i.e.* cramdown) if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Plan Proponents believe that the Plan satisfies these requirements.

The Plan is proposed not only by the Debtor, but also by the Committee and is supported by Global (the Debtor's largest creditor), each of whom has been highly involved in this Chapter 11 Case. As set forth in more detail in Article V(E)(2) of the Disclosure Statement, distributions under the Plan will be made by the Alfs and Non-Debtor Affiliates and all post-Effective Date distributions under the Plan are fully secured by the Securing Parties pursuant to the GUC Security Package, the Global Security Package and the Professional Security Package.

**B.** *No Duty to Update Disclosures*

The Plan Proponents have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified in the Plan, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.**     *Representations Outside this Disclosure Statement*

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

**D.**     *No Admission*

The information and representations contained in the Plan shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

## VII. CONFIRMATION

**A.**     *Plan Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan.  On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Plan Proponents will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Plan Confirmation Hearing.  Upon notice to all interested parties, the Confirmation Hearing will occur before the Honorable Michael J. Kaplan at the U.S. Bankruptcy Court for the Western District of New York, Olympic Towers, 300 Pearl Street, 3rd Floor, Buffalo, New York 14202.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court and served upon the entities identified in the Bankruptcy Court's order approving the Disclosure Statement by the specified deadline.  Bankruptcy Rule 9014 governs objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY FILED WITH THE BANKRUPTCY COURT AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THE PLAN.**

**B.**     *General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following

45

confirmation requirements specified in Section 1129 of the Bankruptcy Code have been satisfied:

(i)      The Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)     The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code;

(iii)    The Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in or in connection with the Reorganization Case, or in connection with the Plan and incident to the Reorganization Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(v)     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Company, an affiliate of the Reorganized Company participating in the Plan, or a successor to the Reorganized Company under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy, and the Debtor has disclosed the identity of any insider that the Reorganized Company will employ or retain, and the nature of any compensation for such insider;

(vi)    With respect to each Class of Claims, each holder of an impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such holders' Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive if the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code (*see* discussion of "Best Interests Test" below);

(vii)   Except to the extent that the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code, each Class of Claims has either accepted the Plan or is not impaired under the Plan (*see* discussion of "Unfair Discrimination" below);

(viii)  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed undisputed Administrative Expense Claims and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such Claims, equal to the Allowed amount of such Claims;

(ix)    At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)     Confirmation of the Plan is not likely to be followed by the liquidation or the need

46

for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(xi)     The Plan provides for the continuation after the Effective Date of payment of all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date; and

(xii)    The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in Section 1114 of the Bankruptcy Code), at the level established pursuant to Subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period that the Debtor has obligated itself to provide such benefits.

## C.     *Plan Consummation*

Upon Confirmation of the Plan by the Bankruptcy Court, the Plan will be deemed consummated on the Effective Date.  Distributions to Holders of Claims or Interests receiving a distribution pursuant to the terms of the Plan will occur on or after the Effective Date, as set forth in the Plan.

## D.     *Separate Classification*

Section 1122(a) of the Bankruptcy Code provides that a "plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  While separate classification of unsecured claims for the sole purpose of creating an impaired assenting class is not permitted, separately classifying similar claims is allowed where the debtor advances a legitimate reason supported by credible proof.  Thus, classification is constrained by two straight-forward rules.  First, dissimilar claims may not be classified together.  Second, and more importantly for the purposes of the Plan, similar claims may be classified separately only for a legitimate reason.

In accordance with the Bankruptcy Code and existing case law, there are legitimate reasons for placing the Unsecured Global Claim (Class 2) in a Class separate from Other Unsecured Claims (Class 3).

Global has no connection with either the Debtor's continued operations or successful reorganization.  The Global Claim is an unsecured judgment claim based on a breach of a broker agreement in connection with an isolated set of aircraft purchases.  There was no prior history of dealings between the Debtor and Global and there will be no future business dealings between the parties.[13]  Whether the Debtor's reorganization is successful will have nothing to do with Global.  Global is *nonessential*.  Conversely, the Other Unsecured Claims and Convenience Class Claims represent the entire pool of creditors with involvement in the Debtor's day-to-day

---

[13] The Global Claim is the only Allowed judgment claim against the Debtor and accounts for approximately 83% of the total value of Allowed General Unsecured Claims.

business operations. These companies and individuals are *essential* to the Debtor's continued operations and successful reorganization, unlike Global.

As noted by the Bankruptcy Court for the Eastern District of New York in *In re Kliegl Bros. Univ. Electric Stage Lighting Co., Inc.*, 149 B.R. 306, 308 (E.D.N.Y. 1992), "it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes." The Plan Proponents submit that its separation of unsecured claims in the Plan satisfies this criteria.

## E. *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in Article VII(F) below, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Claims in Classes 1, 4 and 5 are Unimpaired under the Plan and, as a result, the Holders of such Claims are deemed to have accepted the Plan. The Claims in Classes 2 and 3 are Impaired under the Plan and the Holders of such Claims are entitled to vote to accept or reject the Plan.

## F. *Cramdown*

Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may confirm a plan even if a class of impaired claims or interests votes to reject the plan if the plan does not "unfairly discriminate" and is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

### 1. No Unfair Discrimination

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

Here, the treatment of Claims in Classes 2 (Unsecured Global Claim) and Class 3 (Other Unsecured Claims) are almost identical. Holders in both Classes may receive up to ninety-four percent (94%) of their Allowed Claims over three (3) years (with Global receiving a larger upfront payment and agreeing to a potential downward adjustment as provided for in the Global Settlement Amount Reduction Schedule – two points heavily negotiated by the parties in connection with the Global settlement), with six percent 6% interest on all post-Effective Date payments under the Plan. In addition, the security packages that benefit the Holders of Claims in Classes 2 and 3, the Global Security Package and the GUC Security Package, are identical. Holders of Claims in Class 3 (Other Unsecured Claims) may elect to receive Convenience Class Treatment for their Allowed Claims by so choosing on their Ballots. Such election is in the sole discretion of the Holders of Class 3 Claims. Accordingly, the Plan does not unfairly discriminate against any of the unsecured Claim Classes. Except for the differences discussed in this paragraph, there are no differences between the treatment of the Global Claim in Class 2 and the Other Unsecured Claims in Class 3.

### 2. Fair and Equitable (a/k/a Absolute Priority Rule)

The fair and equitable requirement generally applies to classes of claims of different priority and status, such as secured versus unsecured. For a dissenting class of impaired unsecured creditors, a plan is "fair and equitable" only if the allowed value of the claim is to be paid in full, or if the holder of any claim or interest that is junior to the dissenting creditors will not receive or retain any property under the plan on account of such junior claim or interest. This condition is generally referred to as the "absolute priority rule."

The absolute priority rule prohibits equity interest holders from retaining their equity under a plan unless all senior claims are paid in full. In many cases, a strict application of this rule would be the death knell for an otherwise-confirmable Chapter 11 plan. This is particularly true in Chapter 11 cases of smaller companies where continued participation by current equity holders may be vital to the reorganization effort. Recognizing that sometimes the best option for all parties is to allow old equity to participate in the reorganized debtor, the "new value exception" was created. The new value exception allows equity holders to retain their interests in the debtor even if a senior class of creditors is not paid in full under the plan.

Here, the Plan provides that National Holdings will retain its Shareholder Interests despite General Unsecured Claims not being paid in full. Therefore, the Debtor must satisfy the new value exception.

As set forth in more detail in Section 7.1.2 of the Plan and Article V(E)(2) of the Disclosure Statement, the Alfs and Non-Debtor Affiliates will collectively contribute more than $12,000,000 in New Value Contributions to fund distributions under the Plan, which pays creditors in full or almost in full. This substantial contribution justifies National Holdings' retention of its Shareholder Interest, as evidenced by the support for the Plan by the Committee and Global and the lack of any competing plan despite the fact that the Debtor's exclusive period

49

to file a plan has long since lapsed. Simply, not only are these contributions reasonably equivalent to the equity interest being retained, but they are absolutely vital to the Debtor's ability to successfully reorganize.

The Plan Proponents believe that the Plan is confirmable pursuant to the above-described "cramdown" provisions over the dissent of any Impaired Classes of Claims in view of the treatment proposed for such Classes. Accordingly, the Plan Proponents requests confirmation of the Plan under Section 1129(b) of the Bankruptcy Code over the dissent of any Impaired Class of Claims.

## G.    *Feasibility*

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

Section 7.1 of the Plan and Article V(E) of the Disclosure Statement discusses the means for funding distributions under the Plan. As set forth in more detail therein, Plan distributions will be funded by the Alfs and Non-Debtor Affiliates on behalf of themselves and the Debtor, in exchange for the releases set forth in Section 12.10.2 of the Plan and Article V(N)(10) of the Disclosure Statement, and subject to the retention of equity by National Holdings. Specifically with respect to funding distributions to Holders of Allowed Claims in Classes 2 (Unsecured Global Claim) and 3 (Other Unsecured Claims), the Alfs and Non-Debtor Affiliates have agreed to contribute the sum of $9.5 million (subject to adjustment as provided in the Global Settlement Amount Reduction Schedule), a sum equal to the Aggregate MCA and the Convenience Class Payment, respectively, as set forth in Sections 5.1.2 and 5.1.3 of the Plan. Further, the Alfs and Non-Debtor Affiliates have agreed to fund distributions to Professionals on account of their Allowed Professional Claims on the schedule set forth in the Professional Payment Schedule and discussed in more detail in Section 3.2 of the Plan and Article V(C)(1) of this Disclosure Statement.

Subject to the preceding paragraph, the New Value Contribution shall be funded by the Disbursing Entities on behalf of themselves and the Debtor as follows: (i) the Initial Global Payment shall be made to Global on or prior to the Effective Date; (ii) the Initial GUC Payment shall be made to the Holders of Allowed Other Unsecured Claims on or prior to the Effective Date on a pro rata basis; (iii) the Convenience Class Payment shall be made to the Holders of Convenience Claims on the Effective Date; (iv) the Initial Professional Payment shall be paid on or prior to the Effective Date to the client trust fund account of the Committee's counsel, which shall be held in trust for the Professionals and distributed on a pro rata basis upon the allowance of final fee applications; (v) the Residual Settlement Payment shall be paid to Global on the schedule set forth in the Global Payment Schedule; provided, however, that the Global settlement amount shall be reduced as provided in the Global Settlement Amount Reduction Schedule, as appropriate; (vi) the MCA Payment shall be paid to Holders of Allowed Other Unsecured Claims on the schedule set forth in the GUC Payment Schedule; and (vii) the Residual Professional Payment shall be paid to the Professionals on the schedule set forth in the Professional Payment Schedule. Interest on the Residual Settlement Payment and the MCA

50

Payment shall accrue at 6% per annum. The Residual Settlement Payment is secured by the Global Security Package; the MCA Payment is secured by the GUC Security Package; and the Residual Professional Payment is secured by the Professional Security Package.

**H.** *Best Interests Test*

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date.

The Debtor's costs of a Chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a Chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code. Other costs of liquidating the Debtor's Estate would include the expenses incurred during the bankruptcy case and allowed by the Bankruptcy Court in the Chapter 7 case, such as reimbursable compensation for the Debtor's professionals, including, but not limited to, attorneys, financial advisors, appraisers, accountants. The foregoing types of claims, costs, expenses, and fees that may arise in a Chapter 7 liquidation case would be paid in full before payments would be made towards pre-Chapter 11 priority and unsecured claims. The Plan Proponents believe that in a Chapter 7 liquidation, Holders of Claims and Interests would receive less distribution that such Holders would receive under the Plan.

**I.** *Liquidation Analysis*

As noted above, the Plan Proponents believe that in a Chapter 7 liquidation, Holders of Claims and Interests would receive less distribution that such Holders would receive under the Plan. The Plan Proponents' belief is based primarily on: (i) consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Interests, including (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and professional advisors to the trustee and (b) the substantial delay in distributions to the Holders of Impaired Claims and Interests that would likely ensue in a Chapter 7 liquidation; and (ii) the liquidation analysis prepared by the Debtor (the "Liquidation Analysis"), which is attached as **Exhibit B** to this Disclosure Statement.

The Plan Proponents believe that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. Thus, there can be no assurance as to values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Plan Proponents' conclusions or concur with such assumptions in making its determinations under Section 1129(a)(7) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. This estimate is based solely upon the

51

Debtor's review of its books and records and the Debtor's estimates as to additional Claims that may arise in the event of a conversion of the case from Chapter 11 to Chapter 7. No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims using information available at this time. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Liquidation Analysis is being provided solely to disclose to Holders of Claims the effects of a hypothetical Chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.

## VIII. INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtor and certain Holders of Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Allowed Claims that are not United States persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons holding Allowed Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction, and regulated investment companies). Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtor and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR

OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A. *Certain United States Federal Income Tax Consequences to Holders of Allowed Claims*

1. **Consequences to Holders of Allowed Claims in Classes 1, 2 and 3**

Pursuant to the Plan, Allowed Class 1, Class 2 and Class 3 Claims will be exchanged for Cash distributions. A Holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize income, gain, or loss for United States federal income tax purposes in an amount equal to the difference between: (i) the amount of Cash received in exchange for its Claim; and (ii) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.[14]

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS**

2. **Accrued Interest**

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.

---

[14] *See* the discussions of "accrued interest" and "market discount" below.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. The Internal Revenue Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

### 3. Market Discount

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than: (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest"; or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 4. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because

54

of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the Internal Revenue Service.

The Disbursing Entities, or the applicable withholding agent, will withhold all amounts required by law to be withheld from payments of interest, as necessary. The Disbursing Entities will comply with all applicable reporting requirements of the Internal Revenue Service.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**B.      *Certain United States Federal Tax Consequences to the Debtor***

Under the Internal Revenue Code, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to a debtor in bankruptcy is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not ordinarily required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, the Debtor expects that it may recognize some CODI from the implementation of the Plan. As a result, the Debtor's net operating losses may be reduced on account of such CODI.

## IX. ALTERNATIVES TO PLAN

**A.      *Liquidation Under Chapter 7***

If the Plan is not confirmed, the Chapter 11 Case may be converted to a Chapter 7 case in which case a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Liquidation Analysis prepared by the Debtor provides the likely distributions to creditors under a Chapter 7 liquidation of the Debtor.

The Plan Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because, among other reasons: (i) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (ii) additional expenses and

claims, some of which would be entitled to priority status, which would be generated during the liquidation, including (a) from the rejection of Executory Contracts in connection with a cessation of the Debtor's operations and (b) the fact that Intercompany Claims will not receive a specific distribution if the Plan is confirmed, but will simply ride through the bankruptcy unaltered, as set forth therein, but in a Chapter 7 liquidation, Allowed Intercompany Claims will share in recovery with all other Claims, significantly diluting the claim pool.

## B.      *Alternative Plan of Reorganization*

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve reorganization and continuation of the Debtor's business or an orderly liquidation of the Debtor's assets under Chapter 11. However, the Plan Proponents have concluded that the Plan enables creditors to realize the most value under the circumstances.

In liquidation under Chapter 11, the Debtor would still incur the expenses associated with the closing or transferring to new operators the various facilities and properties. The process would be carried out in a more orderly fashion over a greater period than it would under Chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a Chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a Chapter 7 case. Although preferable to a Chapter 7 liquidation, the Plan Proponents believe that liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return provided by the Plan.

## C.      *Dismissal of the Debtor's Chapter 11 Case*

Dismissal of all of the Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of all of the Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor. The Plan Proponents believe that these actions could lead ultimately to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Therefore, the Plan Proponents believe that dismissal of the Chapter 11 Case is not a preferable alternative to the Plan.

## X. RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of all creditors, and the Plan Proponents urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and returning their Ballots.

Case 1-14-12414-MJK    Doc 833    Filed 09/21/17    Entered 09/21/17 11:49:35,
Description: Main Document  , Page 61 of 66

Dated: September 19, 2017

**NATIONAL AIR CARGO, INC.**

By:     */s/  Michael Tew*
Name:   Michael Tew
Title:  Treasurer


**LIPPES MATHIAS WEXLER FRIEDMAN, LLP**

 */s/ Raymond L. Fink*
Raymond L. Fink, Esq.
John A. Mueller, Esq.
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
Telephone:  (716) 853-5100
Facsimile:  (716) 853-5199
rfink@lippes.com
jmueller@lippes.com

· *Counsel to the Debtor and*
*Debtor-in-Possession*

# Exhibit A

(*See* Plan filed separately at Docket No. 834)

# Exhibit B

## Hypothetical Liquidation Scenario

| Liquidated Assets | Book Balance as of April 30, 2017 | Estimated Recovery Rate Low | High | Estimated Liquidation Value Low | High |
|---|---|---|---|---|---|
| Cash | $ 96,563 | 100% | 100% | $ 96,563 | $ 96,563 |
| Accounts Receivable | 478,963 | 75% | 100% | 359,222 | 478,963 |
| Loans Receivable | - | 5% | 10% | - | - |
| Inventory | - | 30% | 50% | - | - |
| Fixed Assets[1] | 2,577,928 | 20% | 65% | 515,586 | 1,675,653 |
| Deposits | 144,728 | 5% | 10% | 7,236 | 14,473 |
| Other Assets | 98,744 | 15% | 30% | 14,812 | 29,623 |
| Total Assets for Distribution | $ 3,396,926 | 29% | 68% | $ 993,419 | $ 2,295,275 |
| Estimated Administrative Costs[2] | | | | 700,000 | 1,500,000 |
| Total Assets Available for Distribution After Administrative Costs for Wind-down | | | | $ 293,419 | $ 795,275 |
| Total Amount of Secured Claims | | | | $0 | $0 |
| Estimated Amount of Unsecured Claims[3] | | | | $11,726,756 | $11,726,756 |
| Amount Available to Unsecured Claimants[4] | | | | $293,418.85 | $795,275.20 |
| Percentage Recovery to Unsecured Claimants[5] | | | | 2.50% | 6.78% |

The Debtor has prepared this hypothetical liquidation scenario (the "Liquidation Scenario") in connection with the Disclosure Statement. The Liquidation Scenario indicates the estimated values that may be obtained by creditors upon disposition of assets, pursuant to a Chapter 7 liquidation, as an alternative to continued operation of the Debtor's business under the Plan.

[1] Fixed Assets are presented here at their actual cost value. The net book value of fixed assets at April 30, 2017 is $198,373. Although many of these assets are nearly fully depreciated, the value of the assets is closer to their actual cost amount.

[2] In any Chapter 7 liquidation, the fees of the Chapter 7 trustee and its retained professionals are additional administrative expenses paid from Debtor assets that would otherwise be available for distribution to creditors.

This Liquidation Scenario does not take into account these additional administrative expenses, which would further reduce recoveries to holders of unsecured claims.  In addition, post-petition Intercompany Claims, which are not being paid as part of the Plan, are not taken into consideration in this Liquidation Analysis.  In a Chapter 7 liquidation, post-petition Intercompany Claims may (i) not be disregarded and (ii) be entitled to adminstrative expense claim status, which would significantly reduce recoveries for all claim holders.

[3] The Debtor has not yet completed a claims review and this amount is only an estimate.  Further, as discussed in footnote 2, this Liquidation Scenario does not take into consideration Intercompany Claims, which are not being paid under the Plan.  In a Chapter 7 liquidation, pre-petition Intercompany Claims may not be disregarded which would result in a significant dilution of the unsecured claim pool, reducing recoveries to holders of unsecured claims.

[4] The Chapter 7 trustee could choose to pursue the Chapter 5 avoidance actions brought by the Committee that are currently pending in the Debtor's bankruptcy case (the "Avoidance Actions").  Prosecution of the Avoidance Actions by the Chapter 7 trustee may bring distributable assets into the Debtor's estate; however, such litigation is both costly and inherently risky.  The Liquidation Analysis does not take into consideration potential recoveries by, or costs of, the Chapter 7 trustee with respect to the Avoidance Actions.

[5] The Plan provides that each unsecured claimant will receive, in its sole discretion, and as set forth in more detail in the plan, either (i) 60% of its allowed claim in cash on the effective date in full statisfaction of its claim, or (ii) 94% of its allowed claim in cash installment payments over a period of three years in full satisfaction of its claim.